# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J. Fisher, Jr.                                      Elisabeth A. Shumaker
Clerk                                                       Chief Deputy Clerk

January 9, 1998

**TO:**   ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:**   95-1411, *Sports Racing Services, Inc. v. Sports Car Club of America, Inc.*
          October 28, 1997

Please be advised of the following correction to the captioned decision:

Due to a typographical error, a party name in the decision is incorrect.  In the caption on the first page of the opinion, the name of the last defendant should read "MARTIN-DOWNEY MOTORSPORTS, INC.," not "MARTIN DOWNEY MOTOSPORTS, INC."

Please make the appropriate correction to your copy of the opinion.

Very truly yours,

Patrick Fisher, Clerk

Keith Nelson
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 28 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

———————————

| | | |
|---|---|---|
| SPORTS RACING SERVICES, INC.; JOHN K. FREEMAN, | ) ) ) | |
| Plaintiffs-Counter-Defendants - Appellants, | ) ) ) | |
| v. | ) ) | No. 95-1411 |
| SPORTS CAR CLUB OF AMERICA, INC., | ) ) | |
| Defendant-Appellee, | ) ) | |
| and | ) ) | |
| SCCA ENTERPRISES, INC., | ) ) | |
| Defendant-Counter-Claimant - Appellee, | ) ) ) | |
| and | ) ) | |
| DONNEYBROOKE MOTOR RACING EQUIPMENT, INC., and MARTIN-DOWNEY MOTORSPORTS, INC., | ) ) ) ) | |
| Defendants. | ) | |

———————————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 91-N-2067)

_____

Submitted on the briefs:

Glendon L. Laird and June Baker of White & Steele, P.C., Denver, Colorado, for Plaintiffs-Counterclaim-Defendants-Appellants.

F. Kelly Smith, Wheat Ridge, Colorado, for Defendant-Appellee and Defendant-Counter-Claimant-Appellee.

_____

Before **BRORBY** and **EBEL**, Circuit Judges, and **SAM**,** District Judge.

_____

** The Honorable David Sam, District Judge, United States District Court for the District of Utah, sitting by designation.

_____

**EBEL**, Circuit Judge.

_____

Plaintiffs John K. Freeman and Sports Racing Services, Inc. ("SRS") brought this action alleging a variety of antitrust and contract-related claims. They appeal the district court's grant of summary judgment against them on their claims made against Sports Car Club of America, Inc. ("SCCA") and SCCA Enterprises, Inc. ("Enterprises").[1] We

_____

[1]    Plaintiffs do not appeal summary judgment granted in favor of Martin-Downey Motorsports, Inc. In addition, plaintiffs settled with defendant

(continued...)

-2-

conclude that the district court erred in granting summary judgment as to several of the antitrust claims and therefore we affirm in part, reverse in part, and remand for further proceedings.[2]

## I. BACKGROUND

Because this appeal stems from grants of summary judgment, we present the facts in the light most favorable to plaintiffs. SCCA is a nonprofit organization that organizes and sanctions amateur sports car racing events for twenty-three classes of sports cars. The "Spec Racer"[3] and the "Shelby Can Am" are two of the classes sanctioned by SCCA. SCCA governing rules provide specific design and construction criteria for these two classes of cars and allow for virtually no variation. These rules require further that Spec Racer cars and parts be sold only by or through Enterprises, SCCA's wholly-owned, for-profit subsidiary, and that Shelby Can Am cars and parts be sold only through Shelby Technologies, who was not named as a defendant. Enterprises does not sell directly to the racing public, but instead sells only to a network of distributors or "customer service

---

[1](...continued)
Donneybrooke Motor Racing Equipment, Inc. The district court dismissed all claims against Donneybrooke, and it is not party to this appeal.

[2]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

[3]     The Spec Racer was previously called a "Sports Renault," and both terms are used in the record.

representatives" ("CSRs").  Thus, someone wanting to race in the Spec Racer or Shelby

Can Am classes must purchase the authorized car and replacement parts from a CSR (or

subdealer who purchased from a CSR).

John Freeman is a SCCA member who owns and races Spec Racers and Shelby

Can Ams.[4]  He is also the sole owner of SRS, which was a CSR for Spec Racers from

January 1988 until early 1991 when Enterprises terminated it as a CSR.  SRS was located

in Indianapolis, Indiana, and served customers in a number of midwestern states.  It sold

Spec Racer cars and replacement parts, which it had purchased from Enterprises, to

subdealers, racing teams, and drivers, including Freeman.

Freeman and SRS brought this action against SCCA and Enterprises alleging a

variety of antitrust and other claims.[5]  Their amended complaint asserts four antitrust

claims.[6]  For purposes of this appeal, Counts I and II are the most important.  They are

_____

[4]     At least, he was a member and racer at the time this litigation began.
SCCA has since expelled him and revoked his racing license, in part for bringing
this action.  See Freeman v. Sports Car Club of Am., Inc., 51 F.3d 1358 (7th Cir.
1995).

[5]     Because Enterprises is a wholly-owned subsidiary of SCCA and defendants
stated in the district court, and reaffirmed in this court, that "SCCA and
Enterprises must be deemed a single entity under antitrust law," Appellants' App.
at 166-67, we consider them to be a single entity for purposes of the antitrust
portions of this appeal.  Cf. Copperweld Corp. v. Independence Tube Corp., 467
U.S. 752, 771-72 (1984) (considering parent and wholly owned subsidiary a
single enterprise for Sherman Act § 1 purposes).

[6]     To some extent, plaintiffs' individual counts have metamorphosed from the
time of their amended complaint through summary judgment briefing and, to a
                                                                (continued...)

-4-

closely linked because both involve alleged anticompetitive activity in the sale of Spec

Racer cars and parts resulting from defendants' control over both the races themselves

and the cars and parts that can be used in the races. Count I is a claim of monopoly in the

market for Spec Racer cars and parts in violation of § 2 of the Sherman Act, 15 U.S.C.

§ 2. Freeman and SRS claim that defendants have monopolized this market by requiring

that anyone wanting to race Spec Racers in races sanctioned by SCCA use cars and parts

sold only by Enterprises to a CSR, such as SRS, for ultimate resale to a racer, such as

Freeman. Defendants claim that the same cars and parts are available and could be

obtained more cheaply on the open market than from Enterprises and that Enterprises

does not make any meaningful modification to the products other than to put a label on

them to indicate they were purchased from Enterprises. Plaintiffs contend that

defendants' alleged monopolistic control over the market for these cars and parts

---

[6](...continued)
lesser extent, into this appeal. On appeal, defendants have questioned the propriety of plaintiffs articulating arguments in summary judgment briefing that were not stated in their complaint. However, in the absence of a district court ruling that plaintiffs could not amend their complaint through subsequent motions to conform to available evidence, we decline to prevent plaintiffs from raising issues which were presented on summary judgment and which defendants had an opportunity to address in their reply brief to plaintiffs' opposition to summary judgment. Moreover, our interpretation of plaintiffs' claims as refined on appeal apply only in so far as they have an adequate predicate in the district court.

However, our indulgence to plaintiffs' moving claims, poorly constructed and incomplete arguments, and failure to properly raise issues have limits, as indicated by our conclusion that they have waived Counts III and IV.

prohibits the use of cheaper so-called "bandit" products--cars and parts not purchased from Enterprises--and thus allows defendants to overcharge both CSRs and racers for the cars and parts and to prohibit competition in this market.

Count II is a claim of illegal tying in the market for Spec Racer cars and parts in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs claim that defendants have illegally tied a racer's purchase of SCCA's racing services--that is, the ability to compete in SCCA-sanctioned Spec Racer races--to the purchase of cars and parts sold by Enterprises. Thus, the tying product is the racing services and the tied product is the cars and parts. As with their monopoly claim, plaintiffs contend that the tying arrangement forecloses competition in the cars and parts market, prevents racers from buying Spec Racer cars and parts on the open market, and forces racers to pay noncompetitive prices for such products.

Plaintiffs claim they have been injured in a variety of ways by these anticompetitive activities. Freeman claims he was injured as the sole shareholder of SRS because defendants' anticompetitive activity prevented SRS from competing in the relevant markets. He also claims that as a racer who purchased cars and parts, he was injured by having to pay illegal overcharges. SRS claims that it has been injured as follows: (1) by having to pay inflated prices as a CSR for cars and parts purchased from Enterprises; (2) by being unable to sell fiberglass body parts to Enterprises; (3) by being unable to consummate the sale of its business once its CSR agreement with Enterprises

was terminated; and (4) by being prevented from competing in the relevant markets against Enterprises and other CSRs.[7]

Plaintiffs also brought two other antitrust claims. Count III (by SRS only) is a claim of exclusive dealing and tying involving Spec Racers and Shelby Can Ams in

---

[7] On appeal, plaintiffs have more fully elaborated on their primary claims of injury. Freeman claims he was damaged in the following manner:

> It is clear that both would-be competitors in the tied product market as well as actual buyers in the tied product market who were coerced into buying products in the tied market, have standing to challenge a tying arrangement as unlawful under § 1 of the Sherman Act. As a consequence of SCCA's violation of antitrust law, SCCA forced its members, including Freeman, to pay higher prices for Spec Racer cars and parts than the prices available in the open market from Chrysler Motors for example. As a car owner, Freeman was forced individually to pay these higher prices. Therefore, Freeman as an individual suffered direct and specific harm as a result of SCCA's unlawful and anti-competitive practices and [has] standing to challenge these practices.

Appellants' Opening Br. at 18-19 (record citations omitted). SRS described its injury as follows:

> It is also undisputed that SRS was prohibited from manufacturing and distributing Spec Racers and Shelby Can Am race cars and parts for these cars by SCCA's rules, which impose fines and disqualifications for the use of parts not purchased from Enterprises. Accordingly, SRS was directly and substantially harmed by SCCA's and Enterprises' per se illegal and anti-competitive practices in the form of artificially inflated prices and the inability to freely compete for customers in the market for Spec Racers and Shelby Can Am race cars and parts and service for these cars.

Id. at 26 (record citations omitted).

violation of § 3 of the Clayton Act, 15 U.S.C. § 14.  Count IV is a claim for monopoly in the market for Shelby Can Am cars and parts in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and is similar to Count I except that it pertains to Shelby Can Am cars rather than Spec Racer cars.  Plaintiffs never developed either of these claims and have presented virtually no argument in the district court or this court regarding their standing to assert these claims, nor have they explained how the district court erred in dismissing these counts.  We therefore conclude they have waived them and affirm the district court's dismissal of Counts III [8] and IV.[9]

---

[8]     The claimed tying violation in Count III involved an alleged tie between Spec Racer cars and Spec Racer replacement parts.  SRS did not raise that claim in its response to summary judgment and has not raised it in this appeal.  The claimed tie between racing services and Spec Racer cars and parts that SRS articulated in response to defendants' summary judgment motion cannot be brought under Clayton Act § 3, because Clayton Act § 3 only covers tying arrangements in which products are tied to other products.  See 15 U.S.C. § 14 (prohibiting certain contracts for sale of "goods, wares, merchandise, machinery, supplies, or other commodities").  See IX Phillip E. Areeda, Antitrust Law ¶ 1700e, at 10 (1991) (noting the lack of importance of § 3's limitations because § 3 "applies only to 'commodities' for resale within the United States" and "because the Sherman Act applies without such limitations and the substantive standard of legality is essentially the same under both statutes").  SRS also failed to raise any arguments in the summary judgment response in the district court or on appeal that it has standing to assert an exclusive dealing claim under Clayton Act § 3.  We therefore conclude that SRS has waived its Clayton Act § 3 claims.

[9]     As to Count IV, plaintiffs failed to present any argument in response to defendants' summary judgment motion supporting their contention that they had standing to pursue this claim.  On appeal, they have made several broad, conclusory statements regarding this claim, such as that SRS was foreclosed from competing in the Shelby Can Am market.  However, they have not explained who

(continued...)

In addition to these antitrust claims, SRS brought three contract-related claims for violation of Indiana statutes governing franchises and for amounts due under several agreements with Enterprises.

After discovery, defendants moved for summary judgment on the antitrust claims on four grounds: (1) the claim under Count II for violation of § 1 of the Sherman Act is invalid because it failed to allege an agreement in restraint of trade; (2) Freeman lacked standing to sue under the antitrust laws; (3) SRS's claimed damages were too remote to be cognizable antitrust damages; and (4) any monopoly power defendants might have held was justified and therefore did not violate § 2 of the Sherman Act. Defendants also moved for summary judgment on the state law claims on the bases that SRS was not a franchisee under Indiana law and that SRS had not shown that it was owed any money under its agreements with Enterprises.

In granting summary judgment to defendants on the antitrust claims, the district court focused only on Freeman's standing and on SRS's antitrust injury and damages.

---

[9](...continued)
Shelby Technologies is, what relationship it has to defendants (other than the fact that SCCA sanctions races for its cars and requires racers to purchase cars and parts from Shelby Technologies), nor whether defendants have any interest in or control over sales of Shelby Technologies' products. Thus, not only did plaintiffs fail to argue standing to assert this count in the district court, they have failed to make a serious attempt to demonstrate how the court erred in denying standing on this count. See Rademacher v. Colorado Ass'n of Soil Conservation Dists. Med. Benefits Plan, 11 F.3d 1567, 1571 (10th Cir. 1993); Hernandez v. Starbuck, 69 F.3d 1089, 1093 (10th Cir. 1995), cert. denied, 116 S. Ct. 1855 (1996).

Addressing Freeman's claims, the court first stated that he could not have standing based on his status as an SRS shareholder because antitrust violations that injure a corporation do not confer standing on a mere shareholder. Freeman does not contest this ruling on appeal. Next, the court determined that because Freeman was only an indirect purchaser from defendants, having purchased products from CSRs such as SRS but never directly from SCCA or Enterprises, Freeman did not have standing under the Supreme Court's three key cases in this area, Kansas v. UtiliCorp United, Inc., 497 U.S. 199 (1990); Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977); and Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968).

Turning to SRS, the court concluded that its claims failed for lack of an antitrust injury because SRS benefitted from the defendants' restrictive conduct that it now claims violated the antitrust laws. That conduct shielded SRS from outside competition because purchasers from unauthorized suppliers of cars and parts could not qualify for sponsored races. Specifically, the court stated that

> even if Enterprises and its CSRs engaged in an illegal tying of its racing
> services to the sale of race cars and component parts, that did not result in
> any injury to the CSRs, including SRS. Rather, it resulted in an assured
> market for Spec Racers and parts. Those consumers who wished to race in
> that class purchased cars and parts from the CSRs. The arrangement clearly
> benefitted the CSRs. In light of this, SRS has not presented a cognizable
> antitrust injury.

District Court Order and Memorandum of Decision at 11. The court then stated that even assuming SRS alleged an antitrust injury, the amount of the injury was too speculative

-10-

because it presumed, incorrectly according to the court, that the demand for cars and parts was sensitive to prices and that sales, and corresponding profits, would increase if prices were lowered. Id. at 11-12.

The court next found that SRS's alleged inability to sell "approved" fiberglass body sections for the cars resulted from its failure to meet Enterprises' standards and not from any antitrust violation. Id. at 13. Finally, the court determined that SRS's claimed injury from not being able to sell its business as a CSR resulted from Enterprises' right to terminate its contract with SRS and not from any of the alleged antitrust violations. Id. The district court did not address SRS's alleged injuries as a competitor who was foreclosed from entering the relevant markets by defendants' anticompetitive activities.

As to SRS's contract-related claims, the district court first determined that SRS had not paid a franchise fee and was not in the business of selling gasoline and/or oil, and therefore was not a franchisee under Indiana law. See Ind. Code §§ 23-2-2.5-1(a)(3) and 2.7-5. The court next determined that the parties had agreed to compromise and settle various contractual amounts due each other, including the amount claimed for car rental and damage, and that SRS had not shown a legitimate factual issue regarding the continuing validity of this claim. Finally, the court determined that Freeman's affidavit attached to the response to defendants' summary judgment motion was a sham designed to create an issue of fact concerning SRS's claim that it earned commissions relating to

sales of Shelby Can Ams. The court therefore disregarded the affidavit and granted summary judgment on the claim of commissions.

We have jurisdiction under 28 U.S.C. § 1291. Our review of a grant of summary judgment is de novo, and we apply the same standard used by the district court under Fed. R. Civ. P. 56(c). See Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995). We note that in a broad sense, summary judgment in antitrust cases should be used sparingly. See City of Chanute v. Williams Natural Gas Co., 955 F.2d 641, 646 (10th Cir.), cert. denied, 113 S. Ct. 96 (1992), overruled in part on other grounds, Systemcare, Inc. v. Wang Lab. Corp., 117 F.3d 1137 (10th Cir. 1997) (en banc). Nonetheless, the usual rules governing summary judgment still apply. See id. at 646-47. Moreover, even in antitrust cases, "[w]e are not limited to the grounds upon which the trial court relied but may base summary judgment on any proper grounds found in the record to permit conclusions of law." Id. at 647.

## II. ANTITRUST CLAIMS

### A. Antitrust Standing Generally

The district court granted summary judgment on the basis of lack of standing on behalf of Freeman and SRS, and therefore it did not address the merits of their claims. Accordingly, this appeal focuses on the issue of standing, and requires us to look at the concept of standing in relationship to the substantive claims.

-12-

To maintain standing to bring an antitrust claim under § 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff must show (1) an "antitrust injury;" and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws. As we have stated in earlier explanations of this two-pronged test:

> [t]o meet the first prong [plaintiffs] must allege a business or property injury, an antitrust injury, as defined by the Sherman Act. An antitrust injury is defined as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. A violation of the Act without resultant injury to the [plaintiffs] is insufficient to confer standing. To establish the second prong of antitrust standing, [plaintiffs] must show the antitrust injury resulted directly from [defendants'] violation of antitrust law.

City of Chanute, 955 F.2d at 652 (internal citations and quotations omitted). Factors to consider in evaluating antitrust standing include:

> (1) the causal connection between the alleged antitrust violation and the harm; (2) improper motive or intent of defendants; (3) whether the claimed injury is one sought to be redressed by antitrust damages; (4) the directness between the injury and the market restraint resulting from the alleged violation; (5) the speculative nature of the damages claimed; and (6) the risk of duplicative recoveries or complex damage apportionment.

Id. n.14 (citing Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 962 n.15 (10th Cir. 1990)); see generally Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 534-45 (1983). The enumerated factors are not "black-letter rules," however, but merely "give more specificity to the inquiry mandated by the two-part test." Sharp v. United Airlines, Inc., 967 F.2d 404, 406, 407 n.2 (10th Cir. 1992).

With regard to Freeman, the district court focused on the second prong of the standing test to find that he did not allege a direct injury and thus had no right to recovery. With regard to SRS, the district court concluded that SRS could show no antitrust injury based on the first prong. Standing is a question of law that we review de novo. See City of Chanute, 955 F.2d at 652.

To some extent, the standing analysis must take into account the type of antitrust claim being asserted. Plaintiffs' standing in this case is thus best understood in the context of their asserted claims--monopolization under Sherman Act § 2 and tying under Sherman Act § 1. As explained below, we agree with the district court that Freeman lacks standing to pursue the monopolization claim because he is an indirect purchaser, but by the same token, we conclude that SRS does have standing to assert the monopolization claim because it is the direct purchaser of cars and parts. Contrary to the district court's conclusion, allowing standing to the direct purchaser eliminates rather than creates speculation regarding injury because the amount of damages is the amount of overcharges to the direct purchaser, and any passing on of overcharges to the downstream buyers is ignored. We also conclude that as a potential competitor foreclosed from entering the market for Spec Racer cars and parts, SRS has standing to assert both the monopoly and tying claims. Further, we conclude that Freeman is not barred by the direct purchaser doctrine from pursuing the tying claim because he is the direct purchaser of the tying product and he was forced to purchase the tied product directly from the source dictated

-14-

by defendants, even though defendants were not the direct seller of the tied product to Freeman.

The standing analysis in this case turns largely on application of the direct purchaser rule. SRS is the direct purchaser of cars and parts from Enterprises, which plaintiffs claim is both the product over which defendants exercise a monopoly and the tied product in their tying claim. Freeman is only an indirect purchaser of cars and parts because any cars and parts he purchased were purchased through SRS. However, he is a direct purchaser of SCCA's racing services, which plaintiffs claim is the tying product or service--that is, Freeman directly purchased SCCA's racing services when he sought to race in SCAA- endorsed races.

The Supreme Court has consistently held that only direct purchasers suffer injury within the meaning of § 4 of the Clayton Act. The Court first addressed this issue in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968). In that case, Hanover alleged that United Shoe had monopolized the shoe manufacturing machinery industry, and it sought damages for overcharges it paid for leasing machinery from United Shoe. United Shoe defended in part on the ground that Hanover had passed on the overcharge to its customers and therefore suffered no injury. See id. at 487-88. The Court rejected this defense, holding that the injury occurs and is complete when the defendant sells at the illegally high price (even if the buyer is only an intermediate buyer), see id. at 489, and that it would be unworkably difficult, considering the variety of factors

-15-

that affect pricing policies, to try to determine the amount of the overcharge that the intermediate buyer passed on to the end user. See id. at 492-93. Thus, the Court held that the antitrust claim properly lay with the direct (or first) purchaser from the defendant, without reduction for any pass-on recoupment that buyer might realize. "We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4." Id. at 489.

In Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), the Court confronted the attempted offensive use of a pass-on theory by indirect purchasers. Illinois Brick and other concrete block manufacturers had sold concrete blocks to masonry subcontractors who in turn sold them to general contractors working for the State of Illinois. The state was thus an indirect purchaser of the blocks in the sense that it did not directly purchase the blocks from the antitrust defendants. The state brought an action under § 1 of the Sherman Act alleging that the manufacturers had conspired to fix and raise the price of blocks, which artificially high price was ultimately passed down to it as the ultimate buyer. The Court concluded that "whatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants." Id. at 728. Rejecting the state's claim, the Court concluded that there was no reason to abandon the Hanover Shoe rule; rather, the full antitrust damages should be recoverable by the direct

purchaser from the antitrust defendant, and no subsequent purchasers should be allowed to sue to recover any such damages, even though the direct purchaser may have successfully passed on to a subsequent purchaser part or all of the illegally inflated price for the product in question. The court observed that allowing indirect purchasers to sue for the passed-on portion of damages suffered by the direct purchaser would create a risk of multiple liability for defendants, see id. at 730, create extremely complex damages determinations requiring difficult apportionment efforts, see id. at 731-32, 737, and create unwieldy multiparty litigation, see id. at 737-41. Instead, the policy of encouraging vigorous private enforcement of the antitrust laws "is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." Id. at 746. As such, the Court held that antitrust claims are properly brought only by direct and not by indirect purchasers from the antitrust defendants.

Kansas v. UtiliCorp United, Inc., 497 U.S. 199 (1990), strongly reaffirmed Illinois Brick and its underlying reasoning in a situation involving overcharges passed on to utility consumers through a regulated utility. The plaintiffs in UtiliCorp were the states of Kansas and Missouri who sued a pipeline and five gas production companies for conspiracy to inflate the price of gas. The states were acting as parens patriae and were asserting the claims of the ultimate purchasers/consumers of the gas. The ultimate purchasers, however, were indirect purchasers from the antitrust defendants because they

purchased the gas from utility companies who had purchased it from the defendants. The

plaintiffs contended that the Illinois Brick rule should not apply here because the direct

purchasers were regulated utilities who passed on all of the overcharges to their

customers. Noting that the rationale underlying Illinois Brick and Hanover Shoe might

not apply in all cases, the Court nevertheless declined to create an exception, stating that

the "possibility of allowing an exception, even in rather meritorious circumstances, would

undermine the [direct purchaser] rule" and would result in an "unwarranted and

counterproductive exercise to litigate a series of exceptions." UtiliCorp, 497 U.S. at

216-17.

B.     Standing with Regard to the Monopolization Claim[10]

1. Freeman

---

[10]     The Supreme Court has described the elements of a Sherman Act § 2
monopolization claim as follows:

> The offense of monopoly under § 2 of the Sherman Act has two
> elements: (1) the possession of monopoly power in the relevant
> market and (2) the willful acquisition or maintenance of that power
> as distinguished from growth or development as a consequence of a
> superior product, business acumen, or historic accident.

United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Monopoly power is
"'the power to control market prices or exclude competition.'" Id. at 571
(quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391
(1956)); see also Tarabishi v. McAlester Reg'l Hosp., 951 F.2d 1558, 1567 (10th
Cir. 1991).

Regarding Freeman's monopoly claim, we agree with the district court's conclusion that because Freeman is an indirect purchaser of Spec Racer cars and parts, he lacks standing to pursue a monopolization claim in the sale of Spec Racer cars and parts. He purchased these products only indirectly through SRS (and other CSRs), and SRS is the direct purchaser with standing to assert this claim. Freeman does not challenge that ruling below.

## 2. SRS

SRS brought its monopolization claims both as a <u>direct purchaser</u> from Enterprises and as a <u>potential competitor</u>, although the district court did not address the latter basis for its claim. As to SRS's claim as a direct purchaser, the district court concluded it lacks antitrust injury because it could pass on the overcharges to its customers and because the defendants' monopoly power in excluding competitors actually redounded to SRS's benefit as it similarly protected SRS from competition. That reasoning is directly contrary to the Supreme Court's holding in <u>Hanover Shoe</u>. <u>Hanover Shoe</u> precludes the argument that SRS did not suffer cognizable antitrust injury merely because it passed overcharges on to its customers or otherwise was shielded from competition by the defendants' anticompetitive behavior. Moreover, the direct purchaser rule actually eliminates any speculation in determining SRS's injury from the alleged overcharge. As a direct purchaser, SRS "may sue for and recover the full amount of the illegal overcharge." <u>Kansas v. Amoco Prod. Co. (In re Wyoming Tight Sands Antitrust Cases)</u>,

-19-

866 F.2d 1286, 1290 (10th Cir. 1989), aff'd, Kansas v. UtiliCorp United, Inc., 497 U.S. 199 (1990).  Thus, to make its prima facie case, SRS need only show an illegal overcharge and the amount of the overcharge.  Hanover Shoe, 392 U.S. at 489; see also Hawaii v. Standard Oil Co., 405 U.S. 251, 262 n.14 (1972) ("[D]amages are established by the amount of the overcharge.  Under § 4, courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way . . . .").

SRS also claimed that defendants' control of the relevant product markets prevented it from becoming defendants' competitor in cars and parts.  See Appellants' App. at 401-02 ("SCCA completely foreclosed any competition in the relevant product markets in this case, therefore making it impossible for SRS or any other parts manufacturer to compete with it on the open market for drivers' business.").  A potential competitor may have standing under the antitrust laws "if he has manifested an intention to enter the business and has demonstrated his preparedness to do so."  Curtis v. Campbell-Taggart, Inc., 687 F.2d 336, 338 (10th Cir. 1982) (quotation omitted); see also Go-Video, Inc. v. Matsushita Elec. Indus. Co. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.), 11 F.3d 1460, 1464-66 (9th Cir. 1993).

The district court did not address SRS's standing as a potential competitor of cars and parts.[11] Though the record contains little if any evidence of SRS's intention and preparedness to enter the business of manufacturing and selling cars or parts, defendants did not move for summary judgment on this basis or address SRS's contention in their summary judgment reply. We therefore conclude that the district court should address on remand SRS's claimed injury as a potential competitor in addition to its claimed injury resulting from overcharges.[12]

C.      Standing with Regard to the Tying Claim

Count II of the complaint alleges that defendants entered into an agreement in restraint of trade in violation of Sherman Act § 1 and thereby inflated the prices of Spec

---

[11]    The court did address SRS's more limited claim that defendants' anticompetitive activities somehow prevented it from selling fiberglass car bodies to Enterprises. As to that claim, we agree with the district court that SRS has not shown that Enterprises' refusal to purchase fiberglass bodies from SRS related to any antitrust violation. Rather, the undisputed evidence shows that the fiberglass did not meet Enterprises' specifications.

[12]    SRS also claims it was injured because it was unable to "consummate the sale of the business" after it was terminated as a CSR and that after termination as a CSR, it was not able to purchase parts except at inflated prices. As noted earlier, the district court rejected the first claim on the basis that any injury resulted from Enterprises' right to terminate its contract with SRS and not from any antitrust violation. On appeal, SRS has failed to present any argument showing how its inability to sell its business resulted from any antitrust violation and has thus failed to show how the district court erred. As to the second claim that after termination as a CSR, it could not purchase parts except at inflated prices, that claim is barred by the direct purchaser rule, because SRS could only be an indirect purchaser of cars and parts once it was no longer a CSR. We thus reject both of these claims.

-21-

Racer cars and parts. In response to defendants' summary judgment motion, plaintiffs further articulated their somewhat vague allegations and stated that the restraint of trade consisted of an illegal tying arrangement whereby defendants required all those who wanted to race Spec Racers in SCCA-sanctioned events to buy approved Spec Racer cars and parts sold through SCCA's wholly-owned subsidiary Enterprises.[13]

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 461 (1992) (quoting Northern Pac. Ry. v. United States, 356 U.S. 1, 5-6 (1958)). Generally, a tying arrangement, is illegal under § 1 of the Sherman Act if it can be shown that: (1) two separate products or services are involved; (2) the sale or agreement to sell one product or service is conditioned on the purchase of another; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected. See id. at 462; Fortner

---

[13]    In their reply brief on appeal, plaintiffs for the first time in this case contend that defendants also established an illegal tying arrangement involving Shelby Can Ams. We consider this issue waived because, as noted earlier, plaintiffs never have explained the relationship between Shelby Technologies and defendants, how CSRs were involved in this relationship (SRS does not appear to have been a CSR for Shelby Can Ams), who sells Shelby Can Ams, or otherwise how this tying arrangement worked. See Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1277-78 (10th Cir. 1994).

Enters., Inc. v. United States Steel Corp., 394 U.S. 495, 498-500 (1969); Fox Motors, Inc.

v. Mazda Distribs. (Gulf), Inc., 806 F.2d 953, 957 (10th Cir. 1986).[14]

_____

[14]     Like any other claim under § 1 of the Sherman Act, plaintiffs' tying claim must be based on the existence of an agreement between two or more parties in restraint of trade. "Section 1 does not proscribe purely unilateral activity by a single entity." Systemcare, Inc. v. Wang Lab., Inc., 117 F.3d 1137, 1140 (10th Cir. 1997). At the time the parties filed their briefs in this case, the law in this circuit, as stated in City of Chanute, 955 F.2d at 650-51, was that a sale agreement between a plaintiff-buyer and a defendant-seller did not satisfy the agreement element of § 1 without a further showing that the defendant had conspired with another party. The only agreement that appears to effectuate the alleged illegal tie is the one between defendants and the racers (the tied parties) participating in SCCA's racing events. The racers must agree to use Enterprises cars and parts in order to get racing services. That agreement is essentially a sale agreement between a plaintiff-buyer and defendant-seller that appeared to be inadequate under City of Chanute to satisfy the § 1 requirement of an agreement.

However, while this appeal was pending, the en banc court undertook reconsideration of the City of Chanute rule in the Systemcare case. We abated this appeal pending our decision in Systemcare, and the ultimate decision by the en banc court overruled City of Chanute on this point. See Systemcare, 117 F.3d at 1145.

Thus, for the purposes of this case, a buyer's agreement with a seller to buy one product (here racing services) only on the condition of buying another product from that seller (here cars and parts), or on the condition of refraining from purchasing the product from another source, satisfies the agreement element of a Sherman Act § 1 offense. As Professor Areeda has explained, "[t]he 'contract, combination, or conspiracy' that triggers § 1 is obviously present when the buyer promises to take his requirements of the second product from a supplier as an express quid pro quo for being allowed to buy the tying product. More generally, the purchase of the second product is inherently an agreement." IX Areeda, supra, ¶ 1700i, at 12.

-23-

Here, plaintiffs alleged that defendants tied the sale of Spec Racer cars and parts to the provision of racing services. They contend that by requiring anyone who purchased racing services (the tying product)--i.e. anyone who entered an SCCA race--to buy only cars and parts (the tied product) sold through Enterprises, defendants foreclosed competition in the sale of Spec Racer cars and parts and drove up the price of those tied products. The alleged tying arrangement is illustrated in the following graph:



Relevant to plaintiffs' claim, two types of parties may have standing to challenge illegal tying arrangements--the purchasers who are forced to buy the tied product to obtain the tying product (the prototypical tying plaintiff), and the competitor who is restrained from entering the market for the tied product, see, e.g., Eastman Kodak, 504 U.S. at 462-63; Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1415 n.15

(11th Cir. 1987).  Both types of plaintiffs are present here; i.e., Freeman is the purchaser of both racing services and cars and parts, and SRS is the potential competitor in the sale of cars and parts.

Freeman, however, is not a direct purchaser from defendants of the tied product (the cars and parts).  Defendants contend, and the district court held, that this fact is fatal to his claim.  But this is not a typical tying situation.  Defendants have structured their distribution arrangement such that Freeman, the direct purchaser of the tying product (racing services), is forced to purchase the tied product indirectly through a CSR supplied by Enterprises rather than through an independent source.

We do not think that the direct purchaser rule bars Freeman's claim in this situation. "'[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'"  Eastman Kodak, 504 U.S. at 464 n.9 (quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984)).

Critical to a tying claim is the fact that the seller forced the buyer to purchase the tied product in order to get the tying product, but it is not critical that the buyer have purchased the tied product directly from the seller.  An illegal tie may be found where the seller of the tying product does not itself sell the tied product but merely requires the purchaser of the tying product to buy the tied product from a designated third party rather

than from any other competitive source that the buyer might prefer.  See, e.g., Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 833-34 (7th Cir. 1978) (finding illegal tying where licensor of mattress trademark required licensee-manufacturers to purchase mattress component from a particular source and where licensor received a financial reward from the approved sources for such sales); Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1570-72 (11th Cir. 1991) (finding possible illegal tying where defendant multilisting service required real estate brokers wanting to use multilist system to join branch of realtor organization not necessarily related to defendant).

However, where a third party is involved in selling the tied product to the plaintiff, most courts have required that the tying product seller have a direct economic interest in the sale of the tied product before an illegal tying arrangement will be found.  See, e.g., Beard v. Parkview Hosp., 912 F.2d 138, 140-44 (6th Cir. 1990) (finding no illegal tying arrangement when hospital required its patients to purchase radiological services (tied product) from a single third party because hospital had no direct economic benefit from sale of tied product); White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 104 (4th Cir. 1987) (finding no tying arrangement where hospital required official interpretations of CT scans from particular radiological group because "hospital is not a competitor in the market for the tied product [interpretations] . . . [and] receives no part of the fee for interpreting the scans"); Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d 1403, 1407-08 (9th Cir. 1984) (holding no illegal tying arrangement where

-26-

airline offered discount air fares--the tying product--only if the customer purchased car rental services from a designated third party because there was no showing the airline had a direct economic interest in the car rentals); Keener v. Sizzler Family Steak Houses, 597 F.2d 453, 456 (5th Cir. 1979) (finding no illegal tie where defendant seller of franchise trademark (tying product) required franchisee to use particular contractor to construct building where defendant "had no stake in that contractor's business, it derived no income from his sales, and it would receive no rental income from the building"); Ohio-Sealy, 585 F.2d at 835; but see Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp., 880 F.2d 1514, 1517 (2d Cir. 1989) (declining to impose an "economic interest" requirement for the tied product, at least where "the same party actually sold the tying and the tied product directly to the consumer").

Courts that have imposed the economic interest requirement when the tied and tying products are sold by different, unrelated sellers have done so generally on the grounds that if the tying product seller does not have an economic interest in the sale of the tied product, the seller "is not attempting to invade the alleged tied product or service market in a manner proscribed by section 1 of the Sherman Act." Beard, 912 F.2d at 142; see also id. at 143 (noting rule is "consistent with the fundamental antitrust policy opposing the use of market power in one part of the economy to acquire power in another part"); Venzie Corp. v. United States Mineral Prods. Co., 521 F.2d 1309, 1317-18 (3d Cir. 1975) ("The absence of a direct interest in the tied product market leaves open the

possibility of a nonpredatory justification for requiring sales only through [designated party] and distinguishes this situation from the solely anti-competitive arrangements which have been branded as per se antitrust violations.").  Importantly, while most of these cases have found no illegal tie because of a lack of economic interest by the tying product seller in the sale of the tied product, none of them, or any others of which we are aware, rejected a tying claim on the basis that the plaintiff did not buy the tied product directly from the seller.

While the clear majority of courts require that the seller derive some economic benefit from sale of the tied product when the tied and tying products are sold by separate, unrelated sellers, we do not need to decide that question in this case.  Here, defendants purchase cars and parts, apparently often on the open market, add markups to the prices they pay, and then resell the goods at the higher prices to the CSRs who, in turn, sell to Freeman and other racers.  Thus, there is no doubt here that defendants have a direct financial interest in the sale of the tied product to Freeman.  Enterprises' sales of cars and parts to the CSRs is totally dependent upon the ability of CSRs to resell their cars and parts to racers like Freeman.  It appears clear that defendants are at least alleged to be using whatever power they have in the tying product market to limit competition in the tied product market for their own economic benefit.

An illegal tie is not consummated, and its anticompetitive effects are not realized, until the tied purchaser is forced to forego his free choice among competitors, and

competitors are thereby denied free access to the market. Here, the alleged effect was not felt until Freeman was required to purchase the tied product from a designated source as a condition to being able to purchase the tying product--racing services. In contrast, when the indirect purchaser doctrine has been invoked to deny a plaintiff standing, there has always been an upstream purchaser who had been subjected to the anticompetitive conduct and experienced the antitrust injury. Illinois Brick itself and UtiliCorp were both price fixing cases in which direct purchasers had bought price-fixed products at inflated prices and then sold the products to the indirect purchasers who were denied standing. Hanover Shoe was a monopolization case in which the defendant monopolized the shoe machinery industry, resulting in overcharges to the plaintiff who leased the shoe-manufacturing equipment directly from the defendant. The Court would not allow the defendant to argue that the plaintiff/direct purchaser's damages should be reduced because the plaintiff might pass on its higher costs to its customers.

The common feature in these cases and others in which the Illinois Brick rule has been applied is that there has always been a direct purchaser who could bring an action to challenge the alleged anticompetitive activity. Thus, in vertical price fixing cases, courts apply the Illinois Brick rule to bar the indirect or secondary purchasers' claims because the intermediary direct purchaser is not precluded from bringing a similar claim. See, e.g., Link v. Mercedes-Benz of N. A., Inc., 788 F.2d 918, 931-32 & n.12 (3d Cir. 1986); Illinois v. Associated Milk Producers, Inc. (In re Midwest Milk Monopolization Litig.),

730 F.2d 528, 531-32 (8th Cir.1984); In re Beef Indus. Antitrust Litig., 600 F.2d 1148, 1163 (5th Cir. 1979); Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1211-14 (9th Cir. 1984).

These vertical restraint cases for price fixing are informative because they recognize standing in the first "innocent" purchaser in the chain of distribution--the direct victim of the anticompetitive activity and the first person with a cause of action--and deny standing to the indirect purchaser whose claim is derivative of the direct purchaser's.

The Illinois Brick rule selects the better plaintiff between two possible types of plaintiffs--direct purchasers and indirect purchasers. The Court chose the direct purchaser primarily to simplify damages determinations and limit the possibility of multiple recovery against the defendant. But it also concluded that allowing the direct purchaser to bring the claim supported "the longstanding policy of encouraging vigorous private enforcement of the antitrust laws." 431 U.S. at 745. Clearly, the rule was not intended to immunize anticompetitive tactics or to eliminate a private cause of action challenging those tactics. Cf. Associated Gen. Contractors, 459 U.S. at 542 (holding that denying standing to remote victim of alleged antitrust violation when more direct victims would have right to maintain own actions "is not likely to leave a significant antitrust violation undetected or unremedied"); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265-66 (1946) ("The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no

-30-

longer confused with right of recovery for a proven invasion of the plaintiff's rights.")
(quotations omitted). Applying the Illinois Brick rule in this situation to bar Freeman's
claim at this point would do just that because there is no other person who could assert a
claim for illegal tying as a purchaser (as opposed to a competitor).[15] Thus, we conclude
that Freeman's tying claim is not barred by the direct purchaser rule.

Nevertheless, there does appear to be a possibility of duplicative recoveries here.
The type of damages Freeman seeks to recover in the tying claim is similar to the type of
damages SRS seeks to recover under its monopolization claim--overcharges in the prices
of cars and parts. The damage calculations for both types of claims may be similar.
Compare, e.g., Hanover Shoe, 392 U.S. at 489-91 (damages for overcharges in
monopolization case represented by difference in price plaintiff paid and price plaintiff
would have paid absent the anticompetitive conduct, which may be evidenced by market
price); with Crossland v. Canteen Corp., 711 F.2d 714, 722 (5th Cir. 1983) (damages in
tying case are difference between amount paid for tied product and fair market price for

---

[15]    The only other possible party here would be SRS, but it is not tied nor can
we see how it was injured by the tie. SRS is "tied" only in the sense that if it
wants to sell cars and parts to Freeman and other racers to use in SCCA-
sanctioned Spec Racer races, it must buy these cars and parts from Enterprises.
This is the basis for SRS's monopolization claim, which is obviously related to
but analytically distinct from the tying claim. Because the tying product
purchasers (here, the purchasers of racing services) are the targeted victims of an
illegal tying arrangement, these purchasers are in the best position to identify an
illegal tie and have the most incentive to bring an action to enforce the
prohibition against tying.

tied product); and Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir. 1982) (damages in tying case are amount by which payments for both tied and tying products exceed their combined fair market value). Thus, were SRS to succeed on its monopolization claim and recover damages for defendants' overcharges, then allowing Freeman to recover the overcharges under his tying claim that were passed on by SRS might subject defendants to multiple liability for the same activity.

We will not attempt to sort any of this out at this time because it is premature, given that this matter is before us only on summary judgment. We raise the issue only to point out that it would be inappropriate to bar Freeman's claim at this point because of the possibility of multiple liability in this case. The evidence required to support the monopolization claim differs considerably from that required to make the tying claim. For example, to prevail on its monopolization claim, SRS must first prove that defendants had monopoly power, "the power to control prices or exclude competition." Grinnell Corp., 384 U.S. at 571 (quotation omitted). Here, the market relevant to SRS's monopolization claim is that for cars and parts. Freeman has the considerably lower burden of proving that defendants possessed sufficient economic power in the tying product market to enable it to restrain trade in the tied product market. See Eastman Kodak, 504 U.S. at 462. "The standard of 'sufficient economic power' does not . . . require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the

-32-

economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market." Fortner Enters., 394 U.S. at 502-03.  Moreover, the market subject to direct economic power is the tying product market, rather than the tied product market.

Thus, it is possible that SRS could be unable to show that defendants maintained sufficient economic power to support its monopolization claim, but that Freeman could make the required showing for his tying claim.  Were this the case, and were we to bar Freeman's claim at this point for fear of possible duplicative liability, defendants' antitrust violations would go unchallenged.   Moreover, the fact that SRS is a party to this action reduces the chance of duplicative recoveries and should allow the district court the opportunity to minimize the risk of duplicative recoveries.  We offer no specific direction on this issue; the parties have not briefed the possible duplicative nature of damages, and we do not want to tie the parties' or district court's hands on remand, assuming the case even gets to a damages phase.  We thus remand both claims to the district court because it was improper to rule on summary judgment that SRS and Freeman lacked standing or justiciable antitrust injury, with the caveat that our ruling does not preclude the district court from guarding against duplicative recoveries in the event this case ever gets that far.

With regard to SRS, it alleges that the illegal tying arrangement, like defendants' monopolization, prevented it from entering the market as a potential competitor.  As with

SRS's monopolization claim, we conclude that the district court needs to address this claim on remand.

D.    Antitrust Issues for Remand

Defendants argue on appeal that the district court's grant of summary judgment should be affirmed even if plaintiffs have standing to sue for antitrust damages because plaintiffs failed to show that defendants have violated the antitrust laws.  In particular, defendants assert that plaintiffs failed to show that defendants monopolized or attempted to monopolize any market and that plaintiffs have failed to identify an illegal tying arrangement.  The district court did not rule on the merits of these arguments because it found that both Freeman and SRS lacked standing to raise the antitrust claims.  Given that fact and the state of the record, we decline to exercise our discretion to address those merits issues for the first time on appeal.

We thus conclude that SRS has standing under Count I (monopolization in the Spec Racer market) and Count II (tying) and that Freeman has standing under Count II. We affirm the district court's dismissal of Count III (tying and exclusive dealing under Clayton Act § 3) and Count IV (monopoly in the Shelby Can Am market).

### III. Contract-Related Claims

A. Count V--Claim under Indiana franchise statutes

Count V is a claim by SRS against Enterprises for violation of the Indiana franchise statutes.  The district court determined that there was no franchise relationship

between SRS and Enterprises because, first, SRS had not paid a franchise fee, and second, because it found that SRS was not in the business of selling both automobiles and gas and/or oil. We agree with the district court's determination on the record before us.

Relevant to this case, there are two ways under Indiana law to show that a particular agreement is a franchise. After meeting two requirements not at issue here, a franchise exists if the alleged franchisee "is required to pay a franchise fee," Ind. Code § 23-2-2.5-1(a)(3), or if the agreement "relates to the business of selling automobiles and/or trucks and the business of selling gasoline and/or oil primarily for use in vehicles with or without the sale of accessory items." Id. at § 23-2-2.7-5. A franchise fee is defined as

> any fee that a franchisee is required to pay directly or indirectly for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement, including, but not limited to, any such payment for goods or services. "Franchise fee" does not include:
>
> . . .
>
> (3) the purchase or agreement to purchase goods at a bona fide wholesale price.

Id. at § 23-2-2.5-1(i). A franchise fee is "a fee paid for the right to do business," and "the evidence must therefore show the payment of an unrecoverable investment" in the franchise. Continental Basketball Ass'n, Inc. v. Ellenstein Enters., Inc., 640 N.E.2d 705, 709 (Ind. Ct. App. 1994), aff'd in relevant part, 669 N.E.2d 134 (Ind. 1996).

SRS first argues that it paid a franchise fee because it purchased cars and parts from Enterprises at prices higher than Enterprises paid. However, as the district court correctly concluded, SRS has not met its burden of showing that the relationship between Enterprises and SRS was anything other than an ordinary wholesaler-retailer relationship, and there is no indication one way or the other whether Enterprises sold products at a "bona fide wholesale price." The mere fact that a seller in an ordinary business relationship sells goods at prices exceeding what it pays does not create a reasonable inference that the seller charges more than bona fide wholesale prices.

SRS also contends that it paid an indirect franchise fee when it purchased its predecessor's business. It paid its predecessor $30,000 for "franchise rights" to be a CSR, and it contends that Enterprises approved this transaction. However, there is no indication that Enterprises received any of this payment or otherwise benefitted from it. The district court was correct in concluding that a payment to a third party that does not provide any apparent benefit to the alleged franchisor is not an indirect franchise fee under the statute. See Implement Serv., Inc. v. Tecumseh Prods. Co., 726 F. Supp. 1171, 1179 (S.D. Ind. 1989).

Finally, SRS argues that the district court erred in granting summary judgment sua sponte on the alternate method of proving a franchise; i.e., whether the agreement "relates to the business of selling automobiles and/or trucks and the business of selling gasoline and/or oil." § 23-2-2.7-5. The district court concluded that

both parties here misinterpret the statute. Both sides focus on the word "automobile" in the statute and look to various sources to come up with a definition of that word. But the statute is broader. In order for the exception to apply, the contract in question must meet three criteria, not two. It must (1) meet the requirements of clauses one and two of section 23-2-2.5-1, (2) be related to the business of selling automobiles and/or trucks, and (3) be related to the business of selling gas and/or oil. Since SRS was not in the business of selling gasoline or oil, the third element is missing.

District Court Order and Memorandum of Decision at 18. SRS contends that there was no evidence in the record on this issue because Enterprises did not contend in its summary judgment motion that SRS had to show it was in the business of selling gasoline or oil.

A court may grant summary judgment sua sponte "so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Though we find this a close question, we conclude that SRS had adequate notice that it should have produced any relevant evidence it had showing it sold gasoline or oil. In its summary judgment motion, Enterprises contended that "[s]ince SRS did not sell trucks, gasoline, or oil, the only issue remaining is whether it sold 'automobiles' within the meaning of the Franchise Act." Appellants' App. at 59. SRS produced no evidence that it did sell gasoline or oil, but instead focused its argument on its claim that it sold "automobiles." As the district court noted, both parties erroneously viewed the franchise statute as requiring either the sale of automobiles, gasoline or oil, not as requiring the sale of both automobiles and gasoline or oil.

-37-

Nonetheless, SRS was on notice that, even under its mistaken interpretation of the statute, it could defeat summary judgment by adducing evidence that it sold gasoline or oil.[16] Enterprises had categorically stated in its motion that SRS could not qualify under the statutory provision for sale of gasoline or oil. That was a premise for Enterprises' contention that the only issue remaining was whether SRS sold automobiles. Thus, while Enterprises focused its argument on automobiles, in doing so, it alerted SRS to the issue of whether SRS sold gasoline or oil as well. That distinguishes this case from those that hold to the effect that "[w]hen a party moves for summary judgment on ground A, his opponent is not required to respond to ground B--a ground the movant might have presented but did not." Malhotra v. Cotter & Co., 885 F.2d 1305, 1310 (7th Cir. 1989); see also Tavery v. United States, 32 F.3d 1423, 1427 n.5 (10th Cir. 1994). Enterprises' motion contended that SRS could not show either A or B--sale of gasoline/oil or

---

[16]     SRS does not argue on appeal that the district court misinterpreted § 23-2-2.7-5 by requiring the franchisee to sell both automobiles and/or trucks and gas and/or oil. That is a literal reading of the statute, though we have some doubt as to whether the Indiana legislature intended that the franchisee sell both automobiles and/or trucks and gasoline and/or oil. See Montgomery v. Amoco Oil Co., 804 F.2d 1000, 1003 (7th Cir. 1986) (stating in dicta that "an agreement which relates to the business of selling gasoline and/or oil, primarily for use in vehicles, is a franchise agreement" under Indiana law). Nevertheless, because neither party appeals the legal interpretation given by the district court of the statute, we accept the interpretation given below as the rule of the case.

automobiles--and SRS chose to respond only with respect to B.[17]  We therefore reject

SRS's contention and affirm the district court's grant of summary judgment on Count V.

B.      <u>Count VII--Breach of contract claim for car rental and damage</u>

SRS brought this claim against both SCCA and Enterprises.  SRS leased cars to

Enterprises for use in Enterprises' National Racing School.  SRS claims Enterprises owes

it about $43,000 for car rental and damage to the cars.  The district court's order fully and

accurately recounts the various transactions and correspondence relevant to this claim.  In

short, after analyzing SRS's claim, Enterprises determined that it owed  SRS only about

$700, and it credited that amount to SRS's account for purchases of cars and parts.  After

this credit, SRS still owed about $16,000 on this account, and the parties eventually

compromised and settled the account.

SRS now claims it never intended to settle the amount Enterprises owed it, but

rather settled only the amount it owed Enterprises.  However, the correspondence clearly

indicates that both parties intended to resolve both claims.  We affirm summary judgment

on this count for the reasons stated by the district court.

C.      <u>Count VIII-Breach of contract claim for unpaid commissions</u>

Count VIII is a claim brought by SRS against Enterprises only.  Enterprises

offered to pay $1,000 commissions to CSRs who referred potential Shelby Can Am

---

[17]    Neither in the district court, such as in a motion for reconsideration, nor on appeal has SRS stated that it could produce evidence it sold gasoline or oil.

customers to it if those customers then purchased cars. SRS claimed that it was owed

unpaid commissions. Enterprises moved for summary judgment based on the fact that

SRS was unable to identify the Shelby purchasers it had referred to Enterprises for which

it earned commissions. In response, SRS filed Freeman's affidavit identifying four

successful referrals. The district court found that this affidavit contradicted Freeman's

deposition testimony and was a sham intended to fabricate a disputed factual issue under

Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986). It therefore disregarded the

affidavit. SRS contends that the affidavit did not necessarily contradict the prior

testimony and should not have been disregarded.

In Freeman's deposition, after he stated that maybe six of his referrals of potential

customers to Enterprises resulted in sales, Freeman testified as follows:

Q. Would Enterprises' records show which referrals were made by you?

A. Probably not.

Q. Where would that record be?

A. I don't know that there would be a record. We were told to
refer those people to Enterprises and we would get this
thousand dollars.

Q. Did you keep a record of who you referred to Enterprises?

A. I don't know if I have a list.

Appellants' App. at 82. The district court interpreted this testimony as Freeman stating

that he "could not or would not even give any names of customers he claims to have

-40-

referred to Enterprises." District Court Order and Memorandum of Decision at 23. In contrast, Freeman's subsequent affidavit identifies four successful referrals, including two purchases by SRS.

In Franks, the court noted that there was "authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements," but concluded that in cases where the affidavit "constitutes an attempt to create a sham fact issue," a court may disregard the affidavit. 796 F.2d at 1237. The court stated that the factors relevant to the existence of a sham fact issue include

> whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

Id.

Our consideration of SRS's claim of error is constrained, as always, by our standard of review. Like other evidentiary rulings, we review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion. See Duffee ex rel. Thornton v. Murray Ohio Mfg. Co., 91 F.3d 1410, 1411 (10th Cir. 1996); see also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 894-98 (1990) (concluding district court did not abuse discretion in declining to admit affidavits on summary judgment); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); Pedraza v.

Jones, 71 F.3d 194, 197 (5th Cir. 1995).  We cannot say that the district court abused its discretion in finding Freeman's affidavit a sham and excluding it.  We therefore affirm its grant of summary judgment on this count.

## IV. SUMMARY

In summary, as to the antitrust claims, we AFFIRM the district court's grant of summary judgment against Freeman on Counts I and IV (monopolization under Sherman Act § 2 involving Spec Racers and Shelby Can Ams, respectively) and against SRS on Count III (tying and exclusive dealing under Clayton Act § 3, not brought by Freeman) and Count IV.  We REVERSE summary judgment against Freeman and SRS on Count II (tying under Sherman Act § 1) and against SRS on Count I.  As to the contract-related claims, we AFFIRM summary judgment on all counts (Counts V, VII and VIII).  The case is REMANDED for further proceedings consistent with this opinion.

AFFIRMED, in part; REVERSED, in part; and REMANDED.