**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 10-2778
_____

WARREN GENERAL HOSPITAL,

Appellant

v.

AMGEN INC.

_____

On Appeal from the United States District Court
for New Jersey
District Court No. 09-cv-04935
District Judge: The Honorable Stanley R. Chesler

_____

Argued January 25, 2011

1

Before: FUENTES and CHAGARES, *Circuit Judges,* and
POLLAK, *Senior District Judge*[*]

(Filed:  June 14, 2011 )

Jeffrey L. Kodroff, Esq.
Jeffrey J. Corrigan, Esq. (Argued)
Spector, Roseman, Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103

*Counsel for Appellant*

Michael R. Griffinger, Esq.
Michael F. Quinn, Esq.
Guy V. Amoresano, Esq.
Christopher Walsh, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102

Bobby R. Burchfield, Esq. (Argued)
Raymond A. Jacobsen, Jr., Esq.
Jon B. Dubrow, Esq.
William Diaz, Esq.
McDermott, Will & Emry LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005

---

[*] Hon. Louis H. Pollak, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

*Counsel for Appellee*

———————————

OPINION OF THE COURT

———————————

FUENTES, *Circuit Judge.*

This appeal raises the question of whether a hospital that purchases certain pharmaceutical products from a wholesaler middleman has standing under Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), to bring an illegal tying claim under federal law against the manufacturer of the pharmaceutical drugs, Amgen. In Illinois Brick, the Supreme Court held that only direct purchasers have standing under Section 4 of the Clayton Act. In this case, plaintiff-appellant Warren General Hospital argues that it falls squarely within the direct purchaser rule, despite the fact that it purchases Amgen's products through a middleman, because (1) it has a direct relationship with Amgen and (2) it is the first "overcharged" purchaser in the chain of distribution. The District Court granted the defendant's motion to dismiss after finding that the hospital was an indirect purchaser of Amgen's products and thus lacked antitrust standing under Illinois Brick. For the reasons that follow, we will affirm.[1]

---

[1] The District Court also granted Amgen's motion to dismiss on the alternative grounds that the Complaint failed to allege a *per se* tying claim. Because we affirm the District Court's dismissal of the complaint for lack of standing, we will not reach this claim.

## I.

The following narrative is adapted from facts set forth in the Complaint. Because the District Court decided this case on a motion to dismiss, we accept as true the factual allegations in the Complaint and draw all reasonable inferences in plaintiff's favor.

Plaintiff Warren General Hospital ("Warren General") is a Pennsylvania not-for-profit corporation that seeks to represent members of a proposed class, composed of other hospitals, clinics, and care centers, that purchase drugs manufactured by defendant Amgen. Amgen is a corporation with its principal place of business in California that manufactures and sells pharmaceutical drugs. On September 25, 2009, Warren General filed an antitrust class action in the District of New Jersey alleging that Amgen violated antitrust law by "tying" the purchase of two of its drugs, Neupogen and Neulasta, to the sale of another Amgen drug, Aranesp. (Compl. ¶ 1).

The heart of plaintiff's claim is that Amgen used its knowledge of medical insurance reimbursement rates to leverage its market power in one market—the market for White Blood Cell Growth Factor ("WBCGF") drugs—to impair competition in the market for Red Blood Cell Growth Factor ("RBCGF") drugs. Warren General alleges that Amgen violated antitrust law by creating an unlawful scheme that "tied" the purchase of Amgen's WBCGF drugs to the purchase of its RBCGF drugs. Because of the low

4

reimbursement rates from medical payors the hospital receives for WBCGF drugs, it is not economically feasible for the hospital to purchase WBCGF drugs at the "market price." Amgen offered Warren General discounts on purchases of its WBCGF drugs that were predicated on the hospital's purchase of Amgen's more expensive RBCGF drug. Although Amgen did not expressly require the hospital to purchase its drugs, Amgen's monopoly of the WBCGF market, combined with its rebate program, implicitly "forc[ed] Plaintiff and class members to make substantial purchases of Amgen's more-expensive RBCGF drug, rather than the cheaper competing [drug] . . . in order to avoid losing money on . . . purchases of Amgen's . . . WBCGF drugs." (Compl. ¶ 1). Absent this tying scheme, the hospital would have preferred to buy cheaper RBCGF drugs offered by Amgen's competitors.

Plaintiff's claims were brought under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Sections 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14, 15. "Tying is selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." Gordon v. Lewistown Hosp., 423 F.3d 184, 213 (3d Cir. 2005).[2] Substantively, plaintiff's claims are grounded in Section 1 of the Sherman Act and Section 3 of the Clayton Act, which proscribe tying schemes. See Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 473-74 (3d Cir.

---

[2] A *per se* tying claim has three elements: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." Town Sound, 959 F.2d at 477.

1992) (en banc). Section 1 of the Sherman Act declares "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . to be illegal." 15 U.S.C. § 1. Section 3 of the Clayton Act makes it "unlawful for any person engaged in commerce . . . to . . . make a sale or contract for sale of goods . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect . . . may be to substantially lessen competition or tend to create a monopoly." 15 U.S.C. § 14. Warren General brings this action pursuant to Section 4 of the Clayton Act, which provides a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a).

Amgen manufactures two WBCGF drugs, known as Neulasta and Neupogen. (Compl. ¶ 3). Neulasta and Neupogen treat neutropenia, "a potentially life-threatening white blood cell deficiency" . . . "which can compromise a patient's immune system." (Compl. ¶¶ 21-22). It is often a side effect of chemotherapy, although it also occurs in other contexts. (Compl. ¶ 21). Neulasta is the newer and more powerful drug, and "is roughly equal to 7 injections of Neupogen." (Compl. ¶ 22). Warren General submits that Amgen holds an effective monopoly in the WBCGF market. (Compl. ¶ 24). Sales of Neupogen and Neulasta make up 98 percent of the market for WBCGF drugs; Neulasta alone

6

controls 86 percent of the WBCGF market share.[3] (Compl. ¶ 24).

Amgen also manufactures a RBCGF drug called Aranesp. (Compl. ¶ 2). Aranesp is used to treat severe anemia of the type experienced by patients undergoing dialysis or chemotherapy or receiving certain treatment for human immunodeficiency virus (HIV). (Compl. ¶ 15). Unlike the WBCGF market, Amgen faces real competition in the RBCGF market, where Ortho Biotech Labs ("Ortho") sells a drug called Procrit. (Compl. ¶ 2). Procrit controls approximately 70 percent of the RBCGF drug market. (Compl. ¶ 2). Yearly sales of Aranesp, Procrit, Neulasta and Neupogen are estimated to be several billion dollars. (Compl. ¶¶ 4, 20, 64).

Sometime in early 2003, Amgen crafted a rebate program that offered the hospital and other members of the putative class rebates on the price of WBCGF drugs that correlated to purchases of Aranesp. Without the rebates, Warren General "would lose money on every administration of [Neupogen and Neulasta]" because "the cost of buying [those drugs] . . . exceeded the amount of reimbursement such purchasers received from Medicare and other health care

---

[3] Another WBCGF drug, Leukine, is sold by Berlex Laboratories. (Compl. ¶ 24). Leukine holds only a "very small" share of the WBCGF market, a situation Warren General attributes to the fact that Leukine is "administered intravenously," a "longer and more costly process." (Compl. ¶ 24). In comparison, Amgen's WBCGF drugs are administered by subcutaneous injection. (Compl. ¶ 24).

payors." (Compl. ¶ 6). Therefore, it became "commercially unreasonable" for plaintiff to purchase Neulasta and Neupogen without the rebates. (Compl. ¶ 6). The terms of the rebate program ensured that the greater the quantity of Aranesp that Warren General Hospital purchased, the greater the value of the rebates it would receive on purchases of Neulasta and Neupogen.

The hospital claimed two types of injuries: First, it was "forced to pay more for Aranesp than they would have paid for Procrit," and second, the hospital "paid more for the bundle of Aranesp and the WBCGF drugs than they would have paid for the bundle of RBCGF and WBCGF drugs." (Compl. ¶ 7). Amgen changed its rebate program over time so that Warren General had "to continue to purchase larger amounts of Aranesp just to receive the same level of rebates they had been receiving." (Compl. ¶ 5). Meanwhile, sales of Aranesp increased significantly: by 2005, sales of Aranesp had increased by 38 percent and were valued at $840 million. (Compl. ¶ 59).

The Complaint did not set forth the mechanics of the hospital's WBCGF and RBCGF purchases. However, at the motion to dismiss stage, it became clear that Warren General Hospital in practice purchases Amgen's drugs through an independent middleman wholesaler known as AmerisourceBergen.

The totality of the Complaint's discussion of the hospital's status as a direct purchaser is contained in Paragraph 13:

8

During the class period, Plaintiff purchased Aranesp, Neulasta and Neupogen directly from Amgen, pursuant to a contract between Amgen and Plaintiff. The contract was negotiated at Warren Hospital between Plaintiff and an Amgen representative, who continued to service the account. The contract also required Amgen to pay the rebated dollars directly to Plaintiff, which it did.

(Compl. ¶ 13). The Complaint identified the relevant contracts and agreements between the two parties: the Amgen Portfolio Contract, the Momentum Rebate, Momentum II, and the Enhanced Momentum II contracts. (Compl. ¶ 27). Otherwise, the Complaint merely repeatedly characterized Warren General Hospital and other members of the putative class as "direct purchasers" of Amgen's drugs. See (Compl. ¶ 14) ("Amgen . . . manufactures and sells Aranesp [and] . . . Neupogen and Neulasta . . . to direct purchasers such as hospitals, doctors and oncology clinics."); (Compl. ¶ 24) ("Amgen has a 98% share of the sales to direct purchasers such as hospitals, doctors and oncology clinics . . . ."); (Compl. ¶ 47) ("[T]here were no such caps on Aranesp purchases, which further coerced direct purchasers such as hospitals, doctors and oncology clinics."); (Compl. ¶ 53) ("Amgen economically coerced direct purchasers such as hospitals, doctors and oncology clinics into purchasing their RBCGF product."); (Compl. ¶ 60) ("Amgen's efforts to use its monopoly power in the WBCGF drug market to coerce direct purchasers such as hospitals, doctors and oncology clinics into buying substantial amounts of Aranesp caused those purchasers to substantially overpay . . . ."); (Compl. ¶ 70) ("Plaintiff brings this action . . . as [a] representative of a

9

[c]lass of all direct purchasers . . . .").

Amgen filed a motion to dismiss on the ground that Warren General lacked antitrust standing under Illinois Brick, which permits only direct purchasers to advance antitrust claims under Section 4 of the Clayton Act. The District Court granted Amgen's motion and dismissed the Complaint in its entirety on the ground that Warren General Hospital was not a "direct purchaser" within the meaning of Illinois Brick.

The District Court noted that the Complaint did not identify the role played by the wholesaler and found that it was appropriate to rely on extrinsic evidence, namely the four contracts and agreements upon which the Complaint relied.[4] "[T]he parties agree[d] that, as documents explicitly referred to and relied on by the Complaint, the contracts may be considered by the Court on this motion to dismiss, even though the documents are extraneous to the Complaint." Warren Gen. Hosp. v. Amgen Inc., 2010 WL 2326254, *1 n.2 (D.N.J. June 7, 2010). After examining the contracts identified in the Complaint, the District Court found that Warren General purchased Amgen products through a wholesaler known as AmerisourceBergen. Id. at *1. The court described the relationship between the plaintiff, the defendant, and the wholesaler as follows:

---

[4] As a general rule, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 97 (3d Cir. 2010) (internal quotation marks and citations omitted). However, "a limited exception exists for documents that are *integral to or explicitly relied* upon in the complaint." Id. (same).

10

> Warren General and other end users of the
> drugs transacted their purchases from Amgen
> pursuant to contracts identified in the
> Complaint as the Amgen Portfolio Contract
> ("APC"), Momentum Rebate, Momentum II
> and Enhanced Momentum II. (Compl., ¶ 27.)
> The contracts are negotiated by a Group
> Purchasing Organization ("GPO") on behalf of
> member hospitals. The Enhanced Momentum II
> contract, pursuant to which Warren General
> made purchases, structures the transaction so
> that Amgen sells Aranesp, Neupogen and
> Neulasta to wholesalers, which in turn sell to
> hospitals. Plaintiff acknowledges in its brief that
> it purchased through wholesaler
> [AmerisourceBergen].

Id. (footnotes omitted). In the medical field, GPOs "negotiate standardized contracts with manufacturers and suppliers of medical devices on behalf of their members." Id. at *1 n.3 (citation and quotation marks omitted). The District Court concluded that the Complaint's characterization of Warren General as a "direct purchaser" was "squarely contradicted by the purchase contracts on which the Complaint relies" which "demonstrate that Warren General pays a wholesaler, not Amgen for the products based on prices which have been set by the wholesaler." Id. at *3. Under these circumstances, "the written instrument controls." Id. (citing ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 859 n.8 (3d Cir. 1994)).

After reviewing the Illinois Brick case law, including a Ninth Circuit case with similar facts, Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson, 523 F.3d 1116,

11

1123-24 (9th Cir. 2008), the District Court held that the hospital purchased Amgen's drugs through AmerisourceBergen and thus was an indirect purchaser barred from asserting this illegal tying claim. The court found that the Complaint's characterization of the plaintiff as a "'direct purchaser' merely parrots the <u>Illinois Brick</u> requirement, without providing any factual basis." <u>Id.</u> at *3. Dismissal of the Complaint in its entirety followed.[5] <u>Id.</u> at *7.

Warren General filed this timely appeal on June 14, 2010.[6]

## II.

Our review of a district court's dismissal of a complaint for failure to state a claim is plenary.[7] <u>Lum v.</u>

---

[5] The District Court also rejected the possibility that Warren General fell under the cost-plus exception to <u>Illinois Brick</u>. Plaintiff does not appeal that conclusion.

[6] We have jurisdiction over an appeal from a final decision of the district court pursuant to 28 U.S.C. § 1291.

[7] The District Court described Amgen's motion to dismiss as a motion for failure to state a claim and ultimately dismissed the complaint for lack of statutory standing. For purposes of our review, this distinction is irrelevant. Under most circumstances, "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim." <u>Baldwin v. Univ. of Pittsburgh Med. Ctr.</u>, 636 F.3d 69, 73 (3d Cir. 2011); <u>see</u> <u>also</u> <u>Maio v. Aetna, Inc.</u>, 221

12

Bank of America, 361 F.3d 217, 223 (3d Cir. 2004). "The issue of antitrust standing is a legal issue, over which we exercise plenary review." McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 847 (3d Cir. 1996) (citing In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1164 (3d Cir. 1993)).

In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), "we accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff." Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002). Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). This requires a plaintiff to plead "sufficient factual matter to show that the claim is facially plausible," thus enabling "the court to draw the reasonable inference that the defendant is liable for misconduct alleged." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). After Twombly and Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937 (2009), "conclusory or bare-bones allegations will no longer survive a motion to dismiss: threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Fowler, 578 F.3d at 210 (internal quotation marks and citation omitted). While the complaint "does not need detailed factual allegations . . . a formulaic

_____

F.3d 472, 482 n.7 (3d Cir. 2000). Our standard of review is the same in either case. Baldwin, 636 F.3d at 73.

recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

On appeal, Warren General Hospital argues that the District Court erred in finding that it lacked standing under Illinois Brick to pursue an illegal tying claim. Warren General urges us to find that it is a "direct purchaser" within the meaning of Illinois Brick. Warren General does not frame this argument as one of creating an "exception" to Illinois Brick; on the contrary, it expressly disavows that approach. Warren General advances two other arguments. First, it maintains that the mechanics of the purchasing relationship between itself, the wholesaler, and Amgen reveal that, in fact, it is the *direct purchaser* of Amgen's pharmaceutical products. Alternatively, Warren General contends that it has direct purchaser standing under Illinois Brick because it is "the first and only party in the distribution chain to be injured by Amgen's tying scheme." (Appellant Br. 35).

We find it useful to begin by reviewing the origins of the direct purchaser doctrine. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. The Supreme Court has developed two limitations on Section 4. See Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 962-63 (3d Cir. 1983). The first restriction, the "direct purchaser rule," limits antitrust actions to suits brought by parties that are the direct purchasers of the

14

product.  See generally Illinois Brick v. Illinois, 431 U.S. 720 (1977).  The second limitation asks whether the "injuries [are] *too remote* [from an antitrust violation] to give them standing to sue for damages under § 4."  Blue Shield of Va. v. McCready, 457 U.S. 465, 476 (1982) (bracketing in original).[8]  In this appeal, only the first limitation is at issue.

The direct purchaser rule was first considered by the Supreme Court in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968).  There, the namesake shoe manufacturer brought suit against a manufacturer and distributor of shoe machinery, alleging that the manufacturer had illegally monopolized the shoe industry, in violation of Section 2 of the Sherman Act.  Id. at 483-84.  The defendant argued that the plaintiff lacked standing to sue under Section 4 of the Clayton Act because the plaintiff had effectively "passed on" any injury to its customers.[9]  Id. at 488 n.6.  The

---

[8] This is in addition to, and distinct from, the constitutional requirement of injury in fact.  See Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983).

[9] In general, "[p]assing on describes the action of an overcharged buyer who passes the extra expense on to those who buy from him."  In re Sugar Industry Antitrust Litig., 579 F.2d 13, 16 n.4 (3d Cir. 1978) (internal quotation marks omitted).  The "passing-on" theory has been invoked in one of two ways: "Defensive passing on refers to efforts by antitrust defendants to show that a particular plaintiff was not injured because he had foisted the inflated price onto his own customers.  Offensive passing on is used to characterize plaintiffs' strategy proving that an overcharge was imposed

15

Supreme Court rejected that defense, finding that only the *direct purchaser* of an illegally overcharged good, and not others in the chain of manufacturing or distribution, is the party "injured" within the meaning of Section 4. Id. at 489-91. The Court based its decision on two conclusions: (1) if indirect purchasers were permitted to bring antitrust suits, the offer of proof alleging injury and the extent of that injury would become extremely complicated, id. at 491-93, and (2) because indirect purchasers would have "only a tiny stake in a lawsuit" and have fewer incentives to sue, a doctrine that allowed *only* indirect purchasers to bring suit would enable antitrust violators to "retain the fruits of their illegality," id. at 493-94.

Illinois Brick tackled the next logical question: may an *indirect purchaser* bring suit against an antitrust violator on the ground that the overcharge cost was passed on to him by the direct purchaser? 431 U.S. at 726. In that case, the defendant was a brick manufacturer and distributor who sold bricks to masonry contractors, who then in turn submitted bids (relying on those bricks) to general contractors. Id. These general contractors then created and submitted bids to final consumers, like the State of Illinois, who became the indirect purchaser of the bricks. Id. The State of Illinois, representing a number of customers, sued the original manufacturer of the bricks under Section 4 of the Clayton Act alleging that the brick manufacturer had engaged in an illegal price-fixing conspiracy. Id. at 726-27. The Supreme Court held that Illinois, which purchased the bricks following "two

upon them by buyers closer to the defendant in the chain of distribution." Id. (internal quotations omitted).

16

separate levels in the chain of distribution," id. at 726, was an *indirect purchaser* without standing, id. at 735.

Illinois Brick rests on three policy considerations. The first policy rationale that the Court drew on was the "serious risk of multiple liability for defendants." Id. at 730. The Court found that permitting the offensive use of the pass-on theory without the defensive use (prohibited in Hanover Shoe) would "create a serious risk of multiple liability for defendants," since defendants could be sued by indirect purchasers and direct purchasers. Id. This would "substantially increase[] the possibility of inconsistent adjudications and therefore of unwarranted multiple liability." Id.

Next, the Court drew attention to the "evidentiary complexities and uncertainties" involved in ascertaining how much of the overcharge was "passed on" to the indirect purchasers. Id. at 732. This problem, which constituted "[t]he principal basis for the decision in Hanover Shoe," was also present in the Illinois Brick factual scenario. Id. at 731-32. The calculations necessary to determine how much of the overcharge had been "passed on" would be "long and complicated" and would have to be "repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff." Id. at 732-33 (internal quotation marks omitted). Therefore, "the difficulty of reconstructing the pricing decisions of intermediate purchasers at each step in the chain beyond the direct purchaser generally will outweigh any gain in simplicity from not having to litigate the effects of the passed-on overcharge on the direct purchaser's volume." Id. at 733 n.13. This is because of the "uncertainties and difficulties in analyzing price and out-put decisions in the real

17

economic world rather than an economist's hypothetical model." Id. at 731-32 (internal quotation marks omitted).

Finally, the Court also examined the third policy rationale: the need for effective enforcement of antitrust law. Id. at 733-34. Relying on Hanover Shoe, the Court explained that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." Id. at 735. Therefore, this rationale also weighed against conferring direct purchaser status.

Although the direct purchaser rule was grounded in these policy rationales, the Supreme Court explicitly stated that its rule was the result of statutory construction. Id. at 736-37 (explaining that "considerations of *stare decisis* weigh heavily in the area of statutory construction" and a "presumption of adherence to our prior decisions construing legislative enactments would support our reaffirmance of the Hanover Shoe construction of [Section 4]"). In making this point, the Court manifested its unwillingness to recognize any exceptions to the direct purchaser rule, id. at 743-45, warning that "the process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the Hanover Shoe rule was meant to avoid," id. at 744-45.

The final case in this trilogy is Kansas v. UtiliCorp United, Inc., 497 U.S. 199 (1990). In UtiliCorp, several public utilities brought suit against a pipeline company and

18

natural gas producers under Section 4 of the Clayton Act, alleging that the defendants conspired to inflate the price of the natural gas supplied to public utilities. Id. at 204-05. The states of Kansas and Missouri, acting as *parens patriae*, asserted the same claims on behalf of all persons residing in the states who purchased the gas. Id. at 204. The defendants argued that the utility companies—the direct purchasers of the gas—lacked standing to bring suit because state and municipal regulations ensured that the utility companies had "passed on" 100 percent of the alleged overcharge to their customers. Id. at 205. The states argued that the residential customers should have standing to bring suit because none of the policies underlying Hanover Shoe or Illinois Brick were implicated and because the customers bore the full cost of the price-fixing conspiracy. Id. at 208.

The Supreme Court acknowledged that "the rationales of Hanover Shoe and Illinois Brick may not apply with equal force in all instances" but held that it was "inconsistent with precedent and imprudent in any event to create an exception for regulated public utilities." Id. With regard to the states' argument that there would be no litigation over the apportionment of the overcharge because they "prove the exact injury to the residential customers," id., the Court found that this argument "oversimplified the apportionment problem," id. at 209. First, the nature of market forces meant it was possible that the overcharge still injured the utility, "even if the utility raise[d] its rates to offset its increased costs." Id. Second, "[e]ven if, at some point, a utility can pass on 100 percent of its costs to its customers, various factors may delay the passing-on process," and thus the utility is also injured by the defendant's actions. Id. at 210. The states also argued Illinois Brick's second policy rationale, the

risk of multiple recoveries, was inapplicable because the plaintiffs sought different damages, that is, the residents "would recover the amount of the overcharge and the utilities would recover damages for their lost sales." Id. at 212-13. The Court roundly rejected this argument, noting that the "case already ha[d] become quite complicated" and "involve[d] numerous utilities and other companies . . . under federal, state, and municipal regulation" and had the potential to expand to other direct purchasers and unrepresented consumers. Id. at 213. Any "expansion of the case would risk the confusion, costs, and possibility of error inherent in complex litigation." Id. Finally, the Court concluded by dismissing the argument that suits by indirect purchasers are more effective at "promot[ing] the vigorous enforcement of the antitrust laws." Id. at 214.

## III.

### A.

We now turn to Warren General Hospital's first argument: that, in practice and based on the facts in the Complaint and its cited agreements, the hospital is the direct purchaser of Amgen's products under Illinois Brick. The hospital argues that the District Court "improperly exalted form over substance in failing to look beyond the existence of a wholesaler and ignoring many other facts that are evidence of [Warren General's] purchaser status," and urges us to hold that the District Court erred when it found that the hospital was an indirect purchaser. (Appellant Br. 26).

In support, the hospital directs our attention to the following features of its relationship with Amgen: (1)

20

"Amgen required [Warren General] to negotiate the purchase requirements, rebates and thus net prices for Aranesp, Neulasta, and Neupogen directly with Amgen", id. at 26-27; (2) Amgen required Warren General to "only communicate directly with Amgen on the net costs and on any other issue regarding these drugs", id.; (3) the contracts between Warren General and Amgen were negotiated at the hospital; (4) the contracts were serviced by an Amgen representative; (5) the costs and rebate amounts were set by Amgen; (6) the rebate opportunities for Warren General were not contingent on AmerisourceBergen's purchases; and (7) Amgen paid the rebates directly to Warren General.

After considering the Complaint, the contracts and documents referred to therein, and the parties' arguments on appeal, we conclude that the District Court correctly determined that plaintiff was an *indirect* purchaser of Amgen's products and, therefore, the Complaint failed to allege a cause of action under Rule 12(b)(6). The mechanics of the transactions between Warren General, Amgen, and AmerisourceBergen reveal Warren General to be an indirect purchaser of Amgen's WBCGF and RBCGF drugs. First, when Warren General wants to purchase Amgen's WBCGF and RBCGF drugs it places its order through AmerisourceBergen. Accordingly, AmerisourceBergen charges Warren General for its order. Second, AmerisourceBergen maintains the right to set the price of the drugs it sells, and thus AmerisourceBergen's price is not necessarily the price it paid Amgen. Third, Warren General physically takes delivery of the shipment from AmerisourceBergen. Fourth, Warren General pays AmerisourceBergen directly; it transmits no funds to Amgen.

21

We agree that the hospital is "the immediate buyer" from AmerisourceBergen, and does not purchase directly from the "alleged antitrust violators." UtiliCorp, 497 U.S. at 207. The purchases go through at least one other stage in the chain of distribution before reaching Warren General, and therefore the situation before us is akin to the facts in UtiliCorp and Illinois Brick. There are no allegations that AmerisourceBergen is controlled or owned by Amgen and thus part of the conspiracy; AmerisourceBergen is a publicly traded company. (Appellee Br. 12). In light of this record, there is no way of getting around the conclusion that Warren General is the *second* purchaser in the chain of distribution.

The facts that Warren General marshals in its support do not persuade us otherwise. We assume the truth of the Complaint's allegations that Amgen and Warren General negotiated the value of the rebates directly, that those negotiations took place on the hospital's property, that Warren General communicated exclusively with Amgen about any cost and issues relating to the drugs, that Warren General was "serviced" by an Amgen representative, and that Warren General's "rebate opportunities" were not contingent on *AmerisourceBergen*'s purchases. Nevertheless, these facts do not transform Warren General into a direct purchaser. At best, they reveal that there were some direct interactions between Amgen and the hospital relating to the rebate program and the volume of Amgen drugs the hospital required.

The only direct financial transaction between Amgen and Warren General was Amgen's payment of the rebates directly to Warren General. Even this financial transaction does not confer direct purchaser standing on the hospital. The

22

value of the rebates was transmitted after the purchases had concluded. The key question in an illegal tying claim is whether the plaintiff purchased the *tied* product from the antitrust defendant. In this case, the hospital simply did not.

The situation is similar to one that arises when a customer buys, for example, a bottle of shampoo from a supermarket. The shampoo manufacturer may offer a rebate to the customer that the customer must submit directly to the manufacturer. Yet it cannot be said that the customer *purchased* the shampoo from the manufacturer just because it subsequently received a rebate from the manufacturer. The customer paid the price of the shampoo directly to the supermarket and received the shampoo from the supermarket. The customer is an indirect purchaser of the shampoo even if the manufacturer set the price of the rebate or communicated with the customer regarding his purchase.

In analyzing the mechanics of the purchasing relationship between Amgen, Warren General, and AmerisourceBergen, our decision in Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc., 424 F.3d 363 (3d Cir. 2005), is instructive. In that case, the plaintiffs were dental laboratories that manufactured dentures using artificial teeth made by Dentsply. Id. at 366. The plaintiffs brought a class action on behalf of themselves and other laboratories that manufactured dentures, asserting that Dentsply and its dealers conspired to monopolize and fix prices in violation of Section 2 of the Sherman Act and Sections 3 and 4 of the Clayton Act. Id. The complaint alleged that the laboratories "purchased [the teeth] *through Dentsply Dealers*". Id. at 372. We held that the dental laboratories were indirect purchasers of Dentsply's products and thus lacked standing under Illinois Brick. Id. at 371. Plaintiffs also sought direct purchaser

23

standing "for teeth drop shipped directly from Dentsply to the labs."[10] Id. at 372. With regard to that allegation, we held that plaintiffs could not "avoid Illinois Brick by claiming they were direct purchasers of drop shipments when their complaint specifically alleges that they did not directly purchase from Dentsply." Id. at 372-73.

Moreover, even assuming that "some of the teeth are drop shipped directly from Dentsply," that did not change "the economic substance of the transaction." Id. at 373. The facts still made out that the laboratories were indirect purchasers because:

> [T]he dealers still make the sale to Plaintiffs and Dentsply makes the sale to the dealers. Plaintiffs pay the dealers their usual price, the dealers take their profit, and then the dealers pay Dentsply. While it is true that the dealers do not take physical possession of the teeth, this is nothing but a formal difference from the typical transaction. Thus, even as to teeth drop shipped directly from Dentsply to the labs, Plaintiffs are indirect purchasers potentially subject to Illinois Brick.

---

[10] Drop shipping occurs when "a dealer does not have certain teeth in stock or could not fulfill a [customer]'s order for some other reason and asks Dentsply to ship the teeth directly to a [customer]. When teeth are drop shipped, the dealer never has physical custody of them, but it does bill the [customer] for the teeth, collect payments from the [customer], and pay Dentsply." Howard Hess, 424 F.3d at 367.

Id. at 373 (internal citation omitted). The transactions between Warren General, AmerisourceBergen, and Amgen share similar features. AmerisourceBergen "make[s] the sale to Plaintiff[]" while the antitrust defendant "makes the sale to the dealer[]." Warren General pays the middleman its price, who "take[s] [its] profits," and finally AmerisourceBergen "pay[s]" Amgen. Id. Moreover, Warren General takes "physical possession" of the drugs from AmerisourceBergen, and unlike the situation in Howard Hess, there are no direct shipments between Amgen and the hospital.

Warren General maintains that the Enhanced Momentum II Contract, which is cited in the Complaint, reveals the existence of a contract "between *Amgen* and [*Warren General*] for the purchase of Amgen's drugs." (Appellant Br. 29) (emphasis added). The Enhanced Momentum II Contract, dated March 31, 2005, sets forth the WBCGF "Rebate Opportunit[ies]" available to Warren General based on its net purchases of RBCGF. (JA 220). Again, there is no doubt that Amgen and Warren General had some direct interactions. However, in our view the Enhanced Momentum II Contract does not confer direct purchaser standing on Warren General. The Enhanced Momentum II Contract sets forth the parameters of the rebate program. It is not a contract for purchases. Moreover, Warren General's status as an indirect purchaser is borne out by another document cited in the Complaint, the Amgen Portfolio Contract. This sample letter agreement sets forth the standards for "physician practice[s]" to participate in Amgen's rebate program. (JA 43). The agreement reveals the role of the middleman wholesaler as an intermediary between Amgen and Warren General. The agreement notes

25

that qualifying physician practices are represented by "a group purchasing organization" which "acts on behalf of its member[s]." (JA 43). It notes that the physician practices and the GPO have a separate agreement and states the physician practice "has engaged Purchasing Group as an *exclusive agent to provide purchasing opportunities for its eligible members*." (JA 43) (emphasis added).

On appeal, Warren General Hospital also asks us to consider several documents that the District Court "overlooked." (Appellant Br. 30). This argument is unavailing. As a threshold matter, we note that, because standing was decided at the motion to dismiss stage, the District Court properly limited itself to the pleadings contained in the Complaint and the agreements cited therein. See West Penn, 627 F.3d at 97. Moreover, assuming that the District Court *had* considered these documents, they would not have resulted in a different outcome.[11]

---

[11] This evidence consists of: (1) a sample 2004 "Physician Clinic Agreement," referring to the "purchase" of the drugs by "Physician Practice[s];" (2) a 2008 "Physician Clinic Agreement" stating that any conflict between the clinics relating to "any purchaser order or invoice" was controlled by the clinic's Agreement with Amgen; (3) a 2007 letter from Amgen to the Centers for Medicare and Medicaid Services discussing a proposed rule that included an attachment where Amgen referred to patients as "customers"; (4) a 2007 letter sent by Amgen to class members that address doctors, clinics, and hospitals as "valued customer[s]," and (5) a template contract between Amgen and a sample clinic that refers to "purchasing opportunities" for eligible members and "purchases" by physicians. (Appellant Br. 31-33)

Finally, Warren General Hospital directs us to two cases that, in its view, reveal that a more flexible approach in determining direct purchaser status is appropriate. See Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,

(emphases omitted) (internal quotation marks omitted). Warren General also draws our attention to statements Amgen made in Ortho Biotech Products, LP., v. Amgen Inc., Case No. 05-cv-4850 (D.N.J.), an antitrust suit Aranesp manufacturer Ortho brought against Amgen.

These various documents do not give rise to direct purchaser standing. First, there is no allegation that Warren General was a party to these agreements or contracts. Moreover, although the contracts show that Amgen permitted physician clinics to purchase products either directly from Amgen or from "Authorized Wholesalers," Warren General concedes that all of its purchases were through a wholesaler. Therefore, even if we considered those agreements, they would not support the hospital's position. Second, we question the relevance of Amgen's characterization of its relationship with class members in promotional materials or correspondence to an agency in a different context. Even if Amgen considered hospitals and clinics to be "customers," that would not negate the fact that Amgen sold its products to hospitals and clinics through an intervening customer—the middleman agency. We find for the same reason that Amgen's use of the word "customer" or "purchaser" in describing hospitals and clinics, or its failure to mention AmerisourceBergen in responding to Ortho's complaint in a separate lawsuit, does not contradict our conclusion that Warren General is an indirect purchaser.

27

995 F.2d 425 (3d Cir. 1993); In re Mercedes-Benz Anti-Trust Litig., 364 F. Supp. 2d 468 (D.N.J. 2005). These cases are distinguishable. In Gulfstream III, the plaintiff signed an agreement to purchase an aircraft, but assigned its purchase agreement to another party before the plane was ready for delivery. 995 F.2d at 430. We held that the plaintiff was a direct purchaser under Illinois Brick because, despite subsequently assigning that right to another party, he had signed the original purchase agreement and thus "remained contractually bound to pay the [aircraft's] total purchase price up to and including the date of delivery." Id. Thus, he began his relationship as a direct purchaser; the issue was whether he retained that status.

Whether Mercedes-Benz was properly decided or not, it is also distinguishable. There, plaintiffs were lessees of Mercedes-Benz automobiles who sued Mercedes-Benz and its dealers for price-fixing the costs of repair parts. 364 F. Supp. 2d at 476-78. The district court held that the lessees were direct purchasers because of "[t]he mechanics of how a leasing transaction is initiated," id. at 480, namely the car lessees negotiated the monthly lease payments directly with the dealership, made its first payments to the dealership, and received the car from the dealership. Id. at 472. In the matter before us, Warren General did not begin its relationship with Amgen as a direct purchaser. Although Warren General and Amgen negotiated the terms of the rebate contracts, plaintiff never placed product orders with Amgen, never paid Amgen directly, and never received any drugs directly from Amgen.

For these reasons, we hold that Warren General Hospital is an indirect purchaser of Amgen's WBCGF and RBCGF drugs and therefore the District Court did not err in

28

dismissing plaintiff's complaint for lack of standing. This result is in line with numerous other cases from this Court recognizing that standing lies with the direct purchaser and not any subsequent downstream purchaser. See Recordex, 80 F.3d at 852 (plaintiff clients whose attorneys had purchased copies of clients' records from photocopying services were indirect purchasers of the photocopies, and thus did not have standing under "the absolute bar of the 'direct purchaser' rule"); Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 929-33 (3d Cir. 1986) (customers of dealerships who alleged that Mercedes-Benz had forced its dealers to purchase parts for repairing vehicle at fixed prices were indirect purchasers of Mercedes-Benz parts); Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573 (3d Cir. 1979) (plaintiffs that purchased "consumer bags" from wholesaler middleman lacked standing to bring an antitrust action against manufacturer of bags).

**B.**

We now turn to Warren General Hospital's argument that it has antitrust standing because it is the first injured party in the chain of distribution. The hospital submits that Illinois Brick—and the policies underlying the direct purchaser rule—confer standing on the first *harmed* direct purchaser, not just the direct purchaser. Applying that theory here, the hospital advances the following facts: (1) Warren General bore the full cost of the overcharge caused by Amgen's rebate scheme; (2) the wholesaler was not affected by the overcharge and was never subject to or targeted by the illegal tying scheme; and (3) the wholesaler was not injured by Amgen's actions. Warren General further submits that,

29

because AmerisourceBergen was not injured by Amgen's actions, it would not have standing to sue Amgen.

It is a basic tenet of antitrust law that a cause of action will not lie if the plaintiff has not been harmed. See Gulfstream III, 995 F.2d at 429. However, the hospital's argument conflates the different components of antitrust standing: the statutory requirement contained in Section 4 that the plaintiff be the direct purchaser as set forth in Illinois Brick and the requirement that the plaintiff have suffered a recognizable injury. See McCready, 457 U.S. at 476 ("Analytically distinct from the restrictions on the § 4 remedy recognized in . . . Illinois Brick, there is the conceptually more difficult question of which persons have sustained injuries *too remote* [from an antitrust violation] to give them standing to sue for damages under § 4.") (bracketing in original) (internal citation and quotation marks omitted); see also Gulfstream III, 995 F.2d at 429 ("[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a *proper party* to bring a private antitrust action.") (quoting Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983)).

The question in this case is whether Warren General is a direct purchaser under Illinois Brick, and we hold that it is not. Hanover Shoe and its progeny did not resolve what party was a direct purchaser by calculating exactly where the harm lay. In fact, the Court's discussion in those cases of the policy rationales underpinning the rule manifests the Court's

30

intent to *avoid* linking direct purchaser status to injury calculations and determinations. In UtiliCorp, the consumer plaintiffs also argued that the public utility (the direct purchaser) had not been harmed by the antitrust defendant's actions, and that consumers had borne the full brunt of the injuries, thus justifying an exception to the Illinois Brick rule. The Court highlighted the need to apply the rule consistently:

> [T]he process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the Hanover Shoe rule was meant to avoid. The litigation over where the line should be drawn in a particular class of cases would inject the same 'massive evidence and complicated theories into treble-damages proceedings, albeit at a somewhat higher level of generality.

> In sum, even assuming that any economic assumptions underlying the Illinois Brick rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions. Having stated the rule in Hanover Shoe, and adhered to it in Illinois Brick, we stand by our interpretation of § 4.

497 U.S. at 216-17 (citations omitted).

In support of its more expansive reading of Illinois Brick, Warren General directs us to Sports Racing Services,

31

Inc. v. Sports Car Club of America, Inc., 131 F.3d 874 (10th Cir. 1997).  Warren General submits that in Sports Racing, "the plaintiff was not barred under Illinois Brick because he was '*the first person with a cause of action*' under the illegal tying scheme, and there was '*no other person who could assert a claim for illegal tying as a purchaser*.'"  (Appellant Br. 38).  We are not persuaded by this reading of Sports Racing, which in any case does not bind this Court.  In the section plaintiff relies on, the Tenth Circuit is describing the direct purchaser cases as "recogniz[ing] standing . . . in the . . . direct victim of the anticompetitive activity and the first person with a cause of action."  Id. at 889.  In describing the Illinois Brick rule, the court was simply equating the "direct victim" as the "first person with a cause of action."  Id.  The court's later discussion makes this clear:  "The Illinois Brick rule selects the better plaintiff between two possible types of plaintiffs—direct purchasers and indirect purchasers. The Court chose the direct purchaser primarily to simplify damages determinations and limit the possibility of multiple recovery against the defendant."  Id.

Moreover, the holding of Sports Racing does not contradict our holding in this case.  There, the plaintiff John Freeman asserted both an illegal tying claim, based on the defendant's tying of "a racer's purchase of [the defendant's] racing services . . . to the purchase of cars and parts sold by [the defendant's exclusive dealerships]," and a monopoly claim alleging that the defendant created a monopoly in car parts.  Id. at 879.  The Tenth Circuit agreed that Freeman was "not a *direct* purchaser from defendants of the tied product (the cars and parts)" but was a direct purchaser of the tying product, the car racing services.  Id. at 887.  However, the fact that Freeman bought the tied product from a third party was

32

not fatal to his tying claim, because the defendants required Freeman to purchase the tied product "indirectly through a [sub-dealership] supplied by [the defendant] rather than through an independent source." Id. Thus, this did not present "a typical tying situation." Id. In this case, of course, Warren General buys neither the tying product nor the tied product from Amgen; the facts show that the hospital buys them directly from an "independent source."

Finally, we find that the three policy rationales sustaining the direct purchaser rule are present in this case. Warren General argues that there is no risk of duplicative recovery in this case, because AmerisourceBergen was not injured by the illegal tying scheme and has no standing to sue. However, we are not persuaded by plaintiff's assurances that AmerisourceBergen was not injured by Amgen's rebate program. The second policy rationale underlying the rule relates to the "evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers." Howard Hess, 424 F.3d at 369-70. Warren General contends that we can easily determine how much of the overcharge created by the illegal tying scheme was "passed on" to the hospital: the entire cost of the overcharge was passed on because AmerisourceBergen's role was to set a market price for WBCGF and RBCGF drugs and then process Warren General's orders. Therefore, so Warren General contends, Amgen's rebate program only affected the ultimate price that *Warren General* paid for the drugs.

This argument oversimplifies the injury calculation. In its direct purchaser cases, the Supreme Court has consistently emphasized the difficulty in calculating how market forces

work on the different purchasers and sellers in an economic system. "The principal basis for the decision in <u>Hanover Shoe</u> was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions in the real economic world rather than an economist's hypothetical model, and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom." <u>Illinois Brick</u>, 431 U.S. at 731-32 (internal citations and quotation marks omitted). In <u>UtiliCorp</u>, the plaintiffs also argued that apportioning damages would be simple; because the utility company "passed on" 100 percent of the overcharge, its customers were injured by the whole amount of the overcharge. Although the Court seemed to agree that the apportionment question was easier in that case, it nonetheless noted that the apportionment calculation presented serious difficulties:

> [W]e do not know whether the [plaintiff UtiliCorp United, a public utility corporation] could have raised its prices prior to the overcharge. Its customers [the indirect purchasers] may have been willing to pay a greater price . . . . To the extent that [UtiliCorp United] could have sought and gained permission to raise its rates in the absence of an overcharge, at least some portion of the overcharge is being borne by it; whether by overcharge or by increased rates, consumers would have been paying more for natural gas than they had been paying in the past. Because of this potential injury, [UtiliCorp United] must remain in the suit. If we were to add indirect purchasers to the action, we would have to

34

> devise an apportionment formula. This is the
> very complexity that <u>Hanover Shoe</u> and <u>Illinois
> Brick</u> sought to avoid.

497 U.S. at 210.

Because of the complicated interplay between market forces, the possibility that the wholesaler was harmed by defendant's actions exists even if the majority of the injury is borne by the indirect purchaser. The prices charged by the wholesaler are typically set by demand for the products it sells. <u>Mid-West Paper Prods.</u>, 596 F.2d at 584 ("As noted in <u>Hanover Shoe</u>, "(a) wide range of factors influence a company's pricing policies. . . . [P]ricing decisions are [also] based on various other considerations, such as marketing strategy and elasticity of demand."). Therefore, when a producer sets certain prices that change demand for its goods, then the wholesaler's sales, prices, and profits may also be affected. This is also true even though Warren General received the earnings from the rebates *after* it paid for the products, because Amgen would need to determine how high a price the market would tolerate, and what to set the rebates at in order to maximize purchases of its RBCGF and WBCGF drug. All of these factors would make it difficult to determine the extent of Warren General and AmerisourceBergen's injuries, and, as the <u>UtiliCorp</u> Court explained, consistent application of the direct purchaser rule is necessary to avoid being mired in these difficult calculations. 497 U.S. at 211.

We find the Ninth Circuit's decision in <u>Delaware Valley Surgical Supply Inc. v. Johnson & Johnson</u>, 523 F.3d

35

1116 (9th Cir. 2008) to be instructive.[12] In that case, a hospital that purchased Johnson & Johnson medical products through a medical supply company brought price-fixing and monopoly claims under Section 4 of the Clayton Act. Id. at 1118, 1122-23. The hospital was a member of a GPO; the GPO negotiated an agreement with Johnson & Johnson setting the prices for certain medical products on the hospital's behalf. Id. at 1119. Using those prices, the hospital negotiated its *own* contract with Johnson & Johnson, but ultimately purchased the products through a *separate* contract with a wholesaler. Id.

The Ninth Circuit rejected the hospital's argument that this independent contractual relationship with Johnson & Johnson gave it antitrust standing. Because the hospital purchased the products through a GPO, the court was bound by the "sensible and straightforward" "bright line rule" set forth in Illinois Brick. Id. at 1122. For two other reasons, the court also rejected the hospital's request for "a new rule . . .

---

[12] Warren General has attempted to distinguish cases arising from price-fixing antitrust claims from tying claims, on the ground that the direct purchaser rule has less traction in the latter. The direct purchaser rule has its origins in statutory construction of Section 4 of the Clayton Act, Illinois Brick, 431 U.S. at 736-37. Therefore, as the hospital conceded at oral argument, it applies here. See also Merican, 713 F.2d at 967 (refusing to limit Illinois Brick to cases of horizontal price-fixing). To the extent that Warren General argues that the *harm* caused by an illegal tying claim is distinct from the harm caused by a price-fixing conspiracy, we find that argument unpersuasive, given the possible injuries in this case.

better attuned to . . . health care providers and manufacturers." Id. at 1123. First, it explained UtiliCorp foreclosed the possibility of any "leeway to make a policy determination on a case-by-case basis . . . when there are special business arrangements." Id. at 1124. Second, conferring standing on the hospital would offend the policy rationales underlying the rule. Contrary to the hospital's assertions, the "distributor is not a completely irrelevant economic actor" in the economic transaction, and therefore the risk of multiple liability and complicated economic injury calculations was present. Id. The price increases created by the defendant's anticompetitive practices might affect the *demand* for the products the wholesaler sells, even if the price *increase* is borne by the indirect purchaser. Id. Apportioning the effect of the overcharge would continue to "force courts to engage in complex factual inquiries" that the direct purchaser rule was created to avoid. Id.

Therefore, because of the possibility that AmerisourceBergen was injured by Amgen's actions, we find that the risk of multiple liability is also present. Moreover, even if we agreed that the middleman purchaser was unable or unwilling to bring a suit, that conclusion does not necessarily weigh in favor of giving the indirect purchaser standing. The Supreme Court confronted a similar possibility in Illinois Brick, when it recognized the possibility that direct purchasers would "refrain from bringing a treble-damages suit," in that case "for fear of disrupting relations with their suppliers." 431 U.S. at 746. Nonetheless, the Court found that application of the direct purchaser rule was warranted, because "on balance . . . the legislative purpose in creating a group of private attorneys general to enforce the antitrust laws . . . is better served by holding direct purchasers to be injured

37

to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." Id. (internal quotation marks omitted). In Merican, we were confronted with a situation where the direct purchaser had executed an affidavit stating that it had not suffered any injuries from the allegedly illegal antitrust action. 713 F.2d at 968-99. Even there, we refused to extend standing to the indirect purchaser in part because Illinois Brick had "recognized . . . that it was possible that direct purchasers might not sue their suppliers in all cases," yet still held that only direct purchasers had standing under Section 4. Id. at 969.

Third, given the complexities of apportionment and the possibility of multiple recovery, the third Illinois Brick rationale, which prioritizes efficient enforcement of the antitrust laws, also weighs in favor of applying the direct purchaser rule.[13]

Ultimately, whether all of the policy rationales underpinning Illinois Brick are exactly replicated in the case before us is not dispositive. The UtiliCorp Court expressly recognized that "[t]he rationales underlying Hanover Shoe

---

[13] We take note of Warren General's argument that AmerisourceBergen would not have standing to bring an antitrust action under Section 4, because it was not injured by Amgen's actions. However, that issue is not before us and the existence or non-existence of AmerisourceBergen's injuries was not considered by the District Court, thus there is no record for us to review. Therefore, we do not find that only a suit brought by Warren General would enforce the antitrust laws.

38

and <u>Illinois Brick</u> will not apply with equal force in all cases." 497 U.S. at 216.  Yet even then, the rule applies.  <u>Id.</u>

While we are sympathetic to Warren General's complaints regarding Amgen's rebate program, our examination of the principles animating <u>Hanover Shoe</u>, <u>Illinois Brick</u>, and <u>UtiliCorp</u> confirm that application of the Court's bright line rule is appropriate in this case.

## IV.

For all of the foregoing reasons, the judgment of the District Court is affirmed.